**Richard A. ADAMO, John D. Subasic, Thomas Ross and Brian F. Hanlon, Plaintiffs,**

v.

**ANCHOR HOCKING CORPORATION, Defendant.**

**Civ. A. No. 87–600.**

United States District Court, W.D. Pennsylvania.

July 27, 1989.

John E. Quinn, Pittsburgh, Pa., for plaintiffs.

Henry J. Wallace, Jr., Pittsburgh, Pa., for defendant.

## OPINION

D. BROOKS SMITH, District Judge.

This matter is before the Court for decision following a non-jury proceeding com-

menced on May 17, 1989.[1] In accordance with Federal Rule of Civil Procedure 52(a) we enter the following findings of fact and conclusions of law:

## Findings of Fact

1. Plaintiffs, Richard A. Adamo (Adamo), John D. Subasic (Subasic), Thomas Ross (Ross), and Brian F. Hanlon (Hanlon) were employees of Anchor Hocking Corporation's Shenango China Division in New Castle, Pennsylvania. (Stipulation of fact ¶¶ 1, 5, 9, 13).

2. Adamo was employed by Anchor Hocking at its New Castle plant from April 16, 1956, to September 19, 1985. (Stipulation of fact ¶ 1).

3. During the last five years of his employment with Anchor Hocking, Adamo served as maintenance foreman. From February to April 1985, Adamo was acting maintenance superintendent. (Testimony of Adamo, Sinibaldi).

4. Adamo resumed his maintenance foreman position in May 1985 when Robert Sinibaldi assumed the maintenance superintendent position. (Testimony of Sinibaldi).

5. After Sinibaldi assumed the maintenance superintendent position, Adamo was bitter and resentful that he did not receive this position and exhibited the same to superintendent Sinibaldi. (Testimony of Sinibaldi).

6. Adamo's actions included violating plant rules on numerous occasions. This included, most notably, leaving the plant without informing others of his departure. This behavior occurred at least 10 times prior to June 5, 1985. (Exhibit B, Testimony of Adamo, Sinibaldi).

7. Adamo also violated the plant rule requiring him to sign visitors in and out of the plant. (Exhibit B, testimony of Sinibaldi).

8. Adamo also violated the plant rule requiring hourly employees to punch in and out when leaving the plant. This violation occurred on Saturday, May 18, 1985, when Adamo took hourly employee, Edgar Hill, an electrician, out of the plant. This instance violated company rules despite the fact that it was for a business purpose, in that hourly employees for insurance reasons, must still punch in and punch out when leaving on company business. (Testimony of Adamo, Sinibaldi).

9. The above violations culminated in a written reprimand by Adamo's supervisor, maintenance superintendent Sinibaldi. This reprimand was shown to Adamo and he was placed on probation from June 5, 1985, until December 31, 1985. (Exhibit B, testimony of Adamo, Sinibaldi).

10. At the time of Adamo's reprimand, Sinibaldi informed Adamo that he had an "attitude problem." Previously, in an appraisal performance done February 1985 by Sinibaldi, Adamo's attitude had been noted as "questionable". (Exhibit 3, B; Testimony of Sinibaldi).

11. Adamo also failed to fulfill his duties as maintenance foreman. This position required that the maintenance foreman be available at all times on weekend duty to handle problems occurring with plant equipment. Adamo, however, failed to comply with this requirement and on Sunday, July 28, 1985, he left the plant from 8:50 A.M. until 1:10 P.M. At that time, a kiln broke down and no maintenance individual was available to take charge of the problem or direct its repair. This incident resulted in a loss of both company hours of production and ware. (Exhibit F, Testimony of Adamo, Sinibaldi, Mills).

12. Adamo was also absent on Sunday, August 4, 1985, having left the plant at 11:30 A.M., and failing to return. Although there were no breakdowns of equipment at that time, this behavior failed to meet the standards of a maintenance foreman on duty for a Saturday/Sunday. (Exhibit F; Testimony of Adamo, Sinibaldi, Mills).

1. A non-jury trial was previously held on May 31, 1988, and June 1, 1988, before the Honorable Hubert I. Teitelman. Findings of fact and conclusions of law were not entered by the Court. Subsequently, by Court Order of November 8, 1988, this matter was reassigned to this Judge. Hence, this second non-jury proceeding.

13. Adamo's failure to meet the standards required of a maintenance foreman was also evidenced by his failure to properly supervise boiler trouble at the plant on Sunday, September 15, 1985. Adamo contacted the appropriate repairman to correct the problem, but he failed to follow up and assure that the repairs were made and that the boiler was functioning satisfactorily. (Exhibit G).

14. On September 19, 1985, Adamo was terminated by Mr. Mills in the presence of Sinibaldi. Adamo was informed at that time that his discharge was for cause. An effort was made by Mills and Sinibaldi to discuss the reasons for Adamo's discharge; however, Adamo made it clear that he did not want to talk about it at that time and would prefer a meeting in the future. That meeting was never held. (Testimony of Adamo, Sinibaldi, Mills).

15. Adamo was discharged for cause, that is, repeated violations of company rules, and his inability to fulfill the duties required of a maintenance foreman. (Testimony of Sinibaldi).

16. Adamo was denied severance benefits because his discharge was for cause. (Testimony of Dawson).

17. Adamo was not entitled to receive severance pay pursuant to policy 2–10–1, Severance, Layoff, and Recall Procedure for salaried employees. (Testimony of Dawson; Exhibit 1, M).

18. Subasic was employed by Anchor Hocking from August 21, 1978, to January 21, 1986. (Stipulation of fact 5).

19. Subasic's position in the maintenance department was as planner/scheduler. This position was assumed by Sinibaldi because of the implementation of cost cutting measures. Subasic was then assigned to the position of Maintenance Stock Room Clerk. (Testimony of Subasic, Sinibaldi).

20. In May 1985, a computer was put in the maintenance stock room in conjunction with the initiation of the GUTS Program. This GUTS Program was a preventive maintenance program designed to eliminate costs associated with the breakdown of plant machinery. (Testimony of Subasic). The GUTS Program was a critical component of Anchor Hocking's efforts to streamline operations and to trim costs. (Testimony of Mills).

21. Subasic's duties required his participation in inputting data into the GUTS program. Subasic did not receive formal training regarding this duty. (Testimony of Subasic).

22. Subasic did his best to learn and adapt to the GUTS Program. Subasic's efforts in this area did not meet management expectations. Management's dissatisfaction with Subasic's performance, however, was not effectively communicated to him, but rather to his superiors. Management believed that Subasic had the capability to master the GUTS program, but that he lacked the initiative. (Testimony of Subasic, Sinibaldi, Mills).

23. In an effort to enhance Subasic's ability to master the duties associated with the GUTS program, his duties were streamlined so that he could spend greater time on the computer. Despite this rearrangement of his duties, Subasic still failed to meet management's expectations. (Testimony of Sinibaldi, Mills).

24. Subasic was discharged because his performance with regard to inputting data into the GUTS Program indicated that he was unable to master the duties required of his position. (Testimony of Mills).

25. Subasic was denied severance benefits because his discharge was due to his lack of initiative to master the duties required by his position and his poor job performance. (Testimony of Mills, Sinibaldi).

26. Ross was employed by the defendant from June 24, 1974, to January 21, 1986. (Stipulation of fact 9).

27. In October 1985, Ross was transferred from his position as head foreman of the clay forming department to foreman of the underglazing decorating department. This transfer was due to the layoffs of October 1985. (Testimony of Mills) Ross was retained and transferred to the underglazing decorating department because

Ross had strong leadership skills. (Exhibit 16).

28. Ross' transfer was technically a demotion. The company requested that Ross continue to receive the same pay, however, and that he not be demoted on the books. (Exhibit 16).

29. Ross' performance in his former department had been highly commendable. Ross' experience was sought out by his former department while he was in the underglazing department. This necessitated his assisting his former department at times. These temporary absences from his department were approved by his superior Mazzocco, the superintendent of the decorating department. (Testimony of Ross).

30. Ross' performance in the underglazing department necessitated his implementing a new Shop Floor Reporting Program into the normal operations of the department. This system was designed to cut costs and was a critical component of Anchor Hocking's overall plans to cut costs and improve the plant. (Testimony of Ross, Mills).

31. This program was instituted in the underglazing department first. Management viewed this program as a critical component to the plant's plans to improve operations. Management viewed Ross as not taking this program seriously. Management's displeasure, however, was not effectively communicated to Ross. (Testimony of Ross, Mazzocco).

32. Ross was terminated by Mazzocco. This action was taken at the direction of Mills, the plant manager of Anchor Hocking. Mills' decision to have Ross terminated was based on his opinion that Ross' attitude toward the Shop Floor Reporting Program was not conducive to implementing that program and getting it in operation by all of the hourly employees. In short, Ross' performance was not as desired by Mills. Mazzocco terminated Ross and advised him to call personnel regarding his work benefits and severance pay. (Testimony of Mazzocco, Ross).

33. The administrator/senior labor attorney determined after reviewing Ross' records and speaking with Ross' superiors that Ross' discharge was due to his repeated absences from his work area, a poor attitude toward the Shop Floor Reporting Program and his inability to implement the Shop Floor Reporting System. For these reasons, severance benefits were denied. (Testimony of Dawson, Mills).

34. Hanlon was employed by Anchor Hocking from November 2, 1976, to October 3, 1985. (Stipulation of Fact 13).

35. Hanlon was superintendent in the decorating department at Anchor Hocking. (Stipulation of fact 14).

36. At some point from February 1985 to May 1985, Hanlon became aware that one of his employees was cheating with regard to his counts of ware moved from one location to another. By coincidence, this employee was his father-in-law. (Testimony of Hanlon, Mills).

37. Hanlon's responsibility as superintendent of that department required that he thoroughly investigate the incident and do so impartially. Hanlon investigated the incident by merely inquiring of foreman Dennis Michael. Michael then reported to Hanlon that he was satisfied with the counts because of new patterns which had been started in the department. Hanlon accepted Michael's explanation and did not go over the records personally. Hanlon did not notify his supervisors of this incident. (Testimony of Hanlon).

38. Mills discharged Hanlon because Hanlon failed to perform his duties as superintendent as required by management. That is, Hanlon failed to thoroughly and impartially investigate an incident regarding a serious violation of plant rules. Hanlon's conduct tacitly allowed his father-in-law to continue cheating or falsifying his counts with the department. (Testimony of Mills).

39. Severance pay was denied Hanlon because his discharge was for cause, that is tacit approval of an employee's falsification of records and failure to perform the duties of his position. (Testimony of Dawson).

40. During 1985, management at the Shenango Anchor Hocking plant was implementing new programs and cost cutting measures to transform the plant into an efficient and profitable operation. (Testimony of Mills).

41. Management's efforts also resulted in a changed business attitude. Management's former liberal and tolerant attitude was replaced by a stringent intolerance of inefficient and costly employee performance. Management's new business demeanor was an adjunct to its efforts to make the plant more efficient.

42. In October 1985, Anchor Hocking laid off a large number of employees. (Testimony of Mills).

43. As a result of these cutbacks, Ross and Subasic were retained and assigned new jobs. (Testimony Mills—Tr. 163–164, Tr. 139, T. 154).

44. Anchor Hocking is the plan sponsor of an employee welfare benefit plan entitled Severance, Layoff and Recall Procedure for Salaried Employee. This plan appears in Anchor Hocking's Policy and Procedure Manual as policy number 2–10–1. (Exhibit 1, Testimony of Dawson).

45. The plan administrator for the Severance, Layoff and Recall Procedure for salaried employees is Mr. Dawson. Mr. Dawson is Anchor Hocking's senior labor attorney and the vice president of human resources. (Testimony of Dawson).

46. At all times relevant hereto, the administrator's decision regarding severance benefits was largely dependent on the supervisor's articulated reasons for discharging the employee. If an employee questioned his right to receive severance pay, the question was referred to Anchor Hocking's senior labor attorney and Vice President of Human Resources who was also the severance plan's administrator. (Testimony of Dawson).

47. The administrator is given power by the plan to determine all questions concerning interpretation or administration of this policy. (Exhibit 1).

48. The severance policy provides compensation to those employees whose employment is "terminated through no fault of their own". The administrator has interpreted this ambiguous term to mean that severance pay shall only be paid to those individuals who unavoidably lose their jobs due to a layoff, a reduction in force or other circumstances totally unrelated to that employee's performance in the position he presently holds. (Testimony of Dawson, Exhibit 1).

49. The severance plan was originally designed to address layoff situations occurring due to a reduction in force. (Exhibit Q).

50. Severance benefits were consistently granted to only those employees who unavoidably lost their jobs due to a layoff, reduction in force or circumstances totally unrelated to that employee's job performance. (Testimony of Dawson)

51. The severance policy was not fashioned after the termination notice and/or pay policy. Accordingly, the interpretation of the termination notice and/or pay policy's term "discharge for cause" is irrelevant to the interpretation of the severance policy's term "through no fault of their own." (Exhibit 1, 2).

52. The language of the severance plan and the termination pay policy indicate that Anchor Hocking intended to provide termination pay to a greater number of employees than those entitled to receive severance pay. (Exhibit 1, 2).

## CONCLUSIONS OF LAW

1. Jurisdiction of this Court is founded under ERISA, 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(e).

2. The "Severance, Layoff, and Recall Procedure for Salaried Employees", Exhibit 1, is an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1).

3. The severance plan is sponsored and administered by Anchor Hocking. 29 U.S.C. § 1002(16)(A) and (B).

4. The severance plan is administered by Anchor Hocking's senior labor attorney and vice president of human resources.

5. Anchor Hocking controls and influences the administrator of the severance plan.

6. Anchor Hocking is a proper defendant to this action.

7. The severance plan grants the administrator discretionary authority to construe uncertain terms.

8. The scope of review applicable to an ERISA action arising from a denial of benefits from a discretionary severance plan is the arbitrary and capricious standard.

9. The severance plan language which provides "[t]he purpose of this policy is to provide compensation to those employees whose employment is terminated through no fault of their own", Severance Plan, Exhibit 1, has been interpreted by the severance plan administrator to encompass those employees who unavoidably lose their jobs due to a layoff, reduction in force or other circumstances totally unrelated to an employee's performance or nonperformance of the duties attendant to the employee's position.

10. The administrator's interpretation of the severance plan's language "through no fault of their own" is reasonable in light of the plan's language, the plan's predecessor and other employee benefits available to an employee if he loses his job due to his performance or nonperformance of his job duties.

11. The administrator's decision to deny benefits to Richard A. Adamo is consistent with the plan's interpretation in that Richard A. Adamo was discharged for cause for violating plant rules and for his failure to perform his duties as Maintenance Foreman.

12. The administrator's decision to deny benefits to John D. Subasic is consistent with the plan's interpretation in that John D. Subasic was discharged for his inability to perform the duties assigned to him as a Maintenance Stockroom Clerk.

13. The administrator's decision to deny benefits to Thomas Ross is consistent with the plan's interpretation in that Thomas Ross was discharged for his perceived inability to perform the duties assigned to him

as Foreman of the Underglazing Department.

14. The administrator's decision to deny benefits to Brian F. Hanlon is consistent with the plan's interpretation in that Brian F. Hanlon was discharged for his failure to perform the duties attendant to his position as Superintendent of the Decorating Department.

15. Richard Adamo's termination on September 19, 1985, was not related to the layoff at the Shenango plant in October 1985.

16. John Subasic's termination on January 21, 1986, was not related to the layoffs at the Shenango plant in October 1985. Rather, Subasic was assigned a new job as a result of the October 1985 layoffs.

17. Thomas Ross' termination on January 21, 1986, was not related to the layoffs at the Shenango plant in October 1985. Rather, Ross was retained in October 1985 because he was a valued employee and was reassigned to another department.

18. Brian Hanlon's termination on October 3, 1985, was not related to the layoff at the Shenango Shop in October 1985.

## DISCUSSION

This ERISA action arises from Anchor Hocking's denial of severance pay to plaintiffs, Adamo, Subasic, Ross and Hanlon. Plaintiffs have sued Anchor Hocking to recover the severance pay they believe they were entitled to receive. Anchor Hocking contests this assertion. Anchor Hocking asserts that not only are plaintiffs not entitled to benefits, but also that plaintiffs have sued the wrong party.

## I. THE PROPER PARTIES TO THIS SUIT

ERISA, 29 U.S.C. section 1132(d)(1) and (2) provides:

(1) An employee benefit plan may sue or be sued under this subchapter as an entity. . . .

(2) Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable

against any other person unless liability against such person is established in his individual capacity under this subchapter.

29 U.S.C. § 1132(d)(1) Anchor Hocking contends that this statutory language precludes relief except from the plan and prevents the employer from being a defendant where the employee's claim only benefits. We disagree.

■ Anchor Hocking has cited several decisions from the Third Circuit Court of Appeals, together with several Pennsylvania district court decisions, which it submits support its contention that it is an improper defendant. *Schake v. Colt Industries, Inc.,* 791 F.2d 920 (3rd Cir.1986); *Blattenberger v. Plan Administrator, Non-contributory Pension Plan for Employees of Mine Safety Appliances Company,* No. 81–2256 (W.D. Pa.1982), *aff'd,* 722 F.2d 730 (3rd Cir.1983);[2] *Crawford v. Armour & Co. Salaried Pension Plan,* 3 E.B.C. 2335 (W.D. Pa.1982); *Higman v. Amsted Industries, Inc.,* 2 E.B.C. 1948 (E.D. Pa.1981); *Grossmuller v. International Union, U.A.W.,* 511 F.Supp. 709 (E.D. Pa.1981); *Barrett v. Thorofare Markets, Inc.,* 452 F.Supp. 880 (W.D. Pa.1978). These cases present employers who have been sued by employees to recover benefits allegedly due under an employee benefit plan. In each case, the employee benefit plan was administered by an independent committee which made benefit decisions. As a result, the benefit decisions were made without employer participation. The lack of employer participation in the benefit decision and the fact that the plans had the capacity to be sued, 29 U.S.C. § 1132(d)(1), required the dismissal of the employer as a defendant liable for a judgment. If an employer has controlled or influenced the administrator's decision regarding the award of benefits, however, an employer may be subject to suit. *Reynolds v. Bethlehem Steel Corp.,* 619 F.Supp. 919, 928 (D.C. Md.1984).

■ In the instant case, there was no independent decisionmaker. Plan decisions were made by the plan administrator, Anchor Hocking's senior labor attorney and vice president of human resources. The plan administrator's decision regarding benefits basically reviewed Anchor Hocking's articulated reason for discharge and determined if this reason fell within the plan's criteria. Moreover, Anchor Hocking revised the severance plan in January 1985 in an effort to clarify its ambiguities. This revision was done by the plan administrator in his capacity as senior labor attorney and vice president of human resources. These facts lead us to conclude that the plan was being controlled and influenced, to a degree, by Anchor Hocking. Accordingly, we find Anchor Hocking a proper party defendant in this case. *Reynolds,* 619 F.Supp. at 928.

## II. DENIAL OF BENEFITS

### A. *Standard of Review*

The standard of review to be applied in this case is also at issue. Plaintiffs contend that a *de novo* standard must be applied consistent with *Firestone Tire & Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Defendant submits, however, that the arbitrary and capricious standard must be applied because the severance plan grants the administrator discretionary authority.

■ The Supreme Court recently clarified the standard of review to be utilized in an ERISA action concerning a denial of benefits under section 1132(a)(1)(B) in *Firestone Tire & Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (interpreting 29 U.S.C. 1132(a)(1)(B)). The Court held that

a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibil-

---

**2.** We do not find *Blattenberger* persuasive authority. Judge Teitelbaum's memorandum opinion summarily concludes without discus-

sion that defendant, Mine Safety Appliances, is not a proper defendant.

ity to benefits or to construe the terms of the plan.

*Id.* at ——, 109 S.Ct. at 956. In the event a plan gives an administrator or fiduciary discretion to determine eligibility or to construe uncertain terms, an arbitrary and capricious standard will be applied. When an arbitrary and capricious standard is utilized, the administrator or fiduciary's actions should not be disturbed if reasonable. *Id.* at ——, 109 S.Ct. at 954–55.

■ First, we must determine from the language of the severance plan which standard applies to the case at bar. Defendant asserts that the plan is discretionary because it provides that "[a]ll questions concerning interpretation or administration of this policy shall be referred to the Vice President, Human Resources, whose decisions on matters of interpretation shall be final." Exhibit 1, p. 8. This provision clearly grants the administrator the power to construe uncertain terms. As a matter of law, therefore, the severance plan is discretionary and an arbitrary and capricious standard must be applied. *See Bruch, supra.*

■ The application of an arbitrary and capricious standard to the case at bar means the administrator's interpretation of uncertain terms cannot be disturbed if reasonable. *Bruch,* at ——, 109 S.Ct. at 955. Initially, we are concerned with the administrator's interpretation of the plan's purpose which is to provide compensation for employees terminated through "no fault of their own." The plan fails to clarify this term, but by the plan's language it is clear lay-off situations warrant the payment of severance benefits. The severance plan is copiously riddled with the term lay off, and the description of benefits attendant to both permanent and temporary layoffs.

The previous severance plan[3] which provides "[t]he purpose ... is to establish guidelines ... in the event of a reduction in force" also evinces the severance plan's coverage for employees who lose their job in a reduction in force. Exhibit R. The administrator's testimony provided another example of a situation warranting severance benefits. The administrator explained that severance benefits also would be granted when an employee lost his job due to circumstances unrelated to that employee's performance of his job. This might occur, the administrator submitted, if a superior directed that an employee be terminated because that superior wanted another employee to work in his department. The administrator's example made it clear that severance benefits would be granted in such a situation because the employee's performance had nothing to do with the decision to discharge him. The administrator testified that severance benefits had been granted consistently on this basis during his tenure with Anchor Hocking.

We conclude that the administrator's interpretation of "through no fault of their own" encompasses layoffs, reductions in force and those limited circumstances in which an employee unavoidably loses his job for reasons totally unrelated to the performance of his job. This interpretation is reasonable in light of the plan, its predecessor and other benefits available to a discharged employee. The plan's purpose is to provide severance benefits to those individuals "in recognition of such individual's past service to the Company ..." Severance Plan 2–10–1, Exhibit 1. For those individuals discharged for reasons related to their performance and without cause ten days pay may be given in lieu of termination notice.[4] Termination Notice and/or

---

3. The Severance, Layoff and Recall Procedure for Salaried Employees was revised as of January 1, 1985. Exhibit Q.

4. The Termination Notice and/or Pay Policy provides ten days pay in lieu of notice for those employees discharged without notice. Termination pay is precluded, however, if discharge is "for cause" as enumerated by the policy. Exhibit 2. Each of the plaintiffs received termination pay in lieu of notice. On this basis, plaintiffs

argue they were not discharged for cause and, therefore, lost their jobs "through no fault of their own." This they conclude entitles them to severance pay.

We do not agree with plaintiff's argument. "For cause" as delineated by the Termination Policy includes, but is not limited to, seven types of egregious behavior. Accordingly, an employee could be discharged for violating company rules which fall outside of the termination pay "for cause." That employee would

Pay, Exhibit 2. Moreover, unemployment compensation may be available. Accordingly, we must abide by this construction in determining whether the administrator's denial of benefits was arbitrary and capricious.

The application of the arbitrary and capricious standard to the administrator's decisions regarding eligibility for benefits requires that we affirm the administrator's decision unless the decisions are without reason, unsupported by substantial evidence or erroneous as a matter of law. *Jung v. FMC Corp,* 755 F.2d 708, 711 (9th Cir.1985). We have entered our findings of fact with regard to each plaintiff and the circumstances leading up to his discharge. In each case, some more obvious than others, the individual plaintiff's discharge was due to his performance or nonperformance of his job. Accordingly, the denial of benefits under the severance plan was reasonable and is supported by objective evidence.

We recognize that plaintiffs have alluded to the fact that their terminations were due to a layoff. It is true that a layoff did occur at the Shenango plant during October 1985. However, plaintiffs bear the burden of proving a relationship between their dismissals and that layoff by a preponderance of the evidence. We conclude plaintiffs have not met this burden.

Plaintiff's case in chief was devoid of any evidence relating plaintiffs' terminations to layoffs at the plant. In fact, the only witnesses who testified regarding the layoffs were Anchor Hocking's plant manager, Jim Mills, and the plan administrator. This cutback coincided with ongoing efforts by management to cut costs and streamline operations. In turn, management changed its lax attitude to a no-nonsense business demeanor.

Adamo was a casualty of the company's new approach, not the layoff. His behavior not only cost the company in lost ware and production time, but it also indicated an inability or unwillingness to fulfill the duties of his position. We conclude Adamo's discharge, which occurred at least 10 days before the layoffs, would have occurred even in the absence of the layoffs.

Similarly, we conclude Hanlon's discharge would have occurred despite the layoffs in October 1985. Hanlon's performance was valued by the company until it discovered his tacit approval of his father-in-law's cheating. Hanlon's failure to investigate this conduct would have been inexcusable under any circumstances. It was intolerable in light of the company's ongoing efforts to make the plant a more efficient operation. Hanlon's termination was based purely on his failure to investigate the cheating incident.

Subasic's discharge in January of 1986 was also unrelated to the October 1985 layoff. In fact, the company's reorganization reassignments in October 1985 were the reason Subasic still had a job from October to January. Subasic's continued inability to meet management's expectations, as necessitated by the cost-cutting measures initiated, however, prompted his discharge several months after the layoff.

Finally, Ross' inability to meet managements's expectations also prompted his discharge. While Ross was retained at the time of the layoff because of his supervisory skills, the company required supervisors who could implement cost cutting measures and help transform the plant into an efficient and profitable operation. Ross failed to do this, in the company's view, and was terminated. We conclude that Ross' termination several months after the layoff was due to his inability to perform as management required in the new business environment.

Our findings that all four plaintiffs' discharges were due to their job performances and unrelated to the layoffs in October 1985 further supports the reasonableness of the administrator's decisions denying benefits. We must consider, however, one

receive termination pay. Severance pay, however, would be totally inappropriate because his discharge is attributable to the manner in which he performed his job. For this reason, we find the Termination Notice and/or Pay Policy of little significance in interpreting the ambiguous term "through no fault of their own" or establishing the reasons plaintiffs were discharged.

last factor in determining whether the plan administrator's decisions were arbitrary and capricious. That is, we must weigh the fact that the plan administrator was operating under a conflict of interest. *Bruch,* at ——, 109 S.Ct. at 956.

Our conclusion that Anchor Hocking controlled and influenced the administrator to a degree and was a proper defendant leads to the further conclusion that the administrator had a conflict of interest. *See supra,* section I. We find this conflict of interest did not taint the administrator's decisions in such a manner as to render the decisions arbitrary and capricious. The administrator testified that he applied the plan consistently with regard to all employees in the past. Moreover, the administrator's decisions regarding eligibility were made after a dispassionate review of the evidence pertaining to the employee's discharge. Credibility was not at issue. The administrator had an extensive labor background, and we found his testimony straightforward.

In conclusion, we find the administrator's interpretation of the severance plan to be reasonable. We also find the denial of severance benefits to the plaintiffs to be consistent with the administrator's interpretation, and supported by the evidence. Judgment will be entered for the defendant against each plaintiff.