

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-22-2006

# Hunter v. Fed Express Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3563

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Hunter v. Fed Express Corp" (2006). *2006 Decisions.* Paper 1555.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1555

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>NOT PRECEDENTIAL</u>

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 04-3563

FLORENCE HUNTER

v.

FEDERAL EXPRESS CORPORATION,

Appellant

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No.: 03-CV-06711
District Judge: The Honorable Stewart Dalzell

---

Argued January 26, 2006

Before: RENDELL and SMITH, *Circuit Judges,*
and IRENAS, *District Judge*[*]

(Filed: February 22, 2006 )

Colby S. Morgan, Jr. (argued)
John M. Oehmler
Federal Express Corporation
3620 Hacks Cross Road
Building B, 3rd Floor
Memphis, TN 38125

Christopher J. Moran
Dara P. Newman

---

[*]The Honorable Joseph E. Irenas, Senior District Judge for the District of New Jersey,
sitting by designation.

Simon Moran
1600 Market Street
Suite 2020
Philadelphia, PA 19103
*Counsel for Appellant*


Gregory J. Boles (argued)
Fenner & Boles
1515 Market Street
Suite 1510
Philadelphia, PA 19102
*Counsel for Appellee*

-----

OPINION

-----

SMITH, *Circuit Judge*.

Federal Express Corporation ("FedEx") appeals from an order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment in favor of Florence Hunter on her claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, for restoration of her long term disability ("LTD") benefits. The District Court had jurisdiction under 28 U.S.C. § 1331. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we will reverse the judgment of the District Court.

I.

In 1994, Hunter was a manager of station operations for FedEx and a participant in FedEx's LTD Plan. In July of that year, Hunter stopped working because of

complications with her pregnancy and she began receiving short term disability benefits. In October, during childbirth, she suffered a left occipital hemorrhage infarct and another intracranial hemorrhage in the same location two weeks later. Short term disability benefits continued until January 26, 1995. LTD benefits for an "occupational disability" commenced the following day.[1] On December 11, 1996, Hunter's application for Social Security disability benefits was approved. LTD benefits based on a total disability commenced on January 27, 1997.[2]

FedEx's LTD plan provided that FedEx was the administrator of the Plan. The initial review and processing of disability claims, however, was performed pursuant to a contract by Kemper Insurance. Once benefits were awarded, an employee was obligated to provide "[a]dditional updated substantiation" or risked the suspension of benefits.

Consistent with the above, Kemper occasionally contacted Hunter's primary care physician, Dr. Perlson, regarding her medical status. In August of 1998, in response to an

[1]LTD benefits were payable for either an occupational disability or a total disability. An occupational disability meant an inability "because of a medically-determinable physical impairment or mental impairment . . . to perform the duties of his regular occupation."

[2]A total disability was defined by the LTD Plan as an "inability . . . because of a medically-determinable physical impairment . . . to engage in any substantially gainful activity for which he is reasonably qualified (or could reasonably become qualified) on the basis of his education, training or experience." The term "substantially gainful activity" was not defined by the Plan. The employee benefits handbook, however, provided that "[t]otal disability means you cannot, for physical reasons only, do any work on either a part-time or full-time basis for which you have training, education, or experience or for which you can obtain the education or training."

3

inquiry from Kemper, Dr. Perlson indicated that Hunter was "blind - dyslexic" and he opined that she was not able to work with restrictions. In a form entitled "Evaluation of Physical Abilities," Dr. Perlson noted that Hunter could not drive for more than three hours or lift more than twenty pounds. Her visual clarity and color were unimpaired, but her visual depth perception was limited.

Periodic updates were obtained thereafter. On September 18, 2002, Hunter spoke with a claims representative and confirmed that she was independent regarding her activities of daily living and that she was able to drive short distances. Hunter advised that Dr. Perlson was her only treating physician.

On September 19, 2002, Dr. Perlson completed a LTD Physician Report submitted by Kemper. He documented that Hunter had hypertension and dsylexia secondary to the occipital infarction she sustained in 1994. In response to an inquiry as to Hunter's ability to work full duty, Dr. Perlson checked the "no" box. Although the box regarding Hunter's ability to work part-time was not completed, Dr. Perlson opined that Hunter's only work restriction was that she was not permitted "to read - anything." A computer log entry dated September 27, 2002 indicated that Dr. Perlson advised a Kemper representative that Hunter's cognitive function was "good" and that she "probably can work for a minimum of 25 hrs /week any job as long as there is no reading involved."

In October of 2002, Kemper submitted the documentation it had from Dr. Perlson to Dr. Cohan, a neurologist, for the purpose of conducting a peer review. Dr. Cohan

4

found no objective evidence to support the work restriction outlined by Dr. Perlson, but noted that a neuro-ophthalmologic report would be useful.

Kemper followed this suggestion and arranged for an independent medical examination on November 19, 2002 by Dr. Liu, who was associated with the University of Pennsylvania's Department of Neurology and Ophthalmology. Dr. Liu noted that he was provided limited medical records, no diagnostic studies or reports, and that he was relying on Hunter's history and his examination. Dr. Liu documented that "[o]ver the years she states she has had some recovery, but she states that she can read for two or three minutes at best and then she can no longer read. She states she can read selectively, but cannot read whole passages or memos."

Dr. Liu's physical examination of Hunter revealed that her vision as corrected was "20/20 with the right eye and 20/25 with the left. At near she saw 20/50+2 with the right eye pinholing to 20/30 and with the left she was 20/40+3. She saw 12 of 12 color plates with both eyes. Fields were full to confrontation techniques. Formal fields were not done today." A dilated funduscopic examination was normal. Dr. Liu also performed a "detailed language examination. She can read, write, name, repeat, comprehend, and her speech is fluent. Therefore, we found no aphasia." *Id*. His report also indicated that Hunter did not exhibit any motor or sensory deficits.

Before stating his opinion, Dr. Liu repeated the limitations of his report. He opined that he "found that she was able to read and had no visual field deficits or acuity

deficits related to what reportedly occurred in 1994. I have no objective evidence for visual reading problems at this time and I have only her subjective complaints." He further stated that "[f]rom what I was able to see on my examination today, I do not see her having any problems working at a regular job."

Dr. Liu's report was provided to Dr. Cohan. In a supplemental report dated December 3, 2002, Dr. Cohan adhered to his initial opinion that the data failed to support a functional impairment that would render Hunter unable to engage in any compensable employment for 25 hours. On December 6, 2002, Kemper notified Hunter in a letter that it had reviewed her LTD benefits claim and "determined that no benefits are payable to you for this claim beyond 11/30/02." Kemper explained that it had reviewed Dr. Perlson's documentation and his work restriction precluding reading, together with Dr. Liu's report that Hunter had "essentially normal findings," and that there was "no significant objective evidence for visual reading problems." The notice advised that she had the right to appeal and that she should submit medical documentation to support her claim of a total disability.

Hunter obtained counsel and appealed the termination of benefits to FedEx's Benefits Review Committee ("BRC"). Shortly thereafter, on December 28, 2002, Hunter was examined by Paul Suscavage, OD. He opined that she "managed Snellen chart OK" and had "good central vision with current use of spectacles." The results of a visual field analyzer demonstrated "marked field loss," greater in the right eye than the left eye, and

6

"stereo vision reduced to 25%." An MRI of the brain performed on December 31, 2002 showed an "area of chronic hemorrhagic infarction . . . in the left occipital lobe. Multiple small round foci of high signal intensity were noted in the subcortical white matter." There was no evidence of any acute or subacute condition.

Hunter was also examined by Dr. Klazmer, a neurologist, and Psychologist Joseph Tracy, Ph.D. Dr. Tracy concluded that Hunter had several neuropsychological deficits, the "most significant deficits are in visual perceptual and visuospatial reasoning consistent with her occipital stroke." Deficits were also noted with regard to executive function and some psychomotor skills. Dr. Tracy also noted that Hunter displayed "a clinically significant level of depression." He stated that he "consider[ed] Ms. Hunter disabled" and opined that he did not believe that Hunter was "capable of working at her previous levels which apparently involve managerial work handling customer complaints at Federal Express. Speeded and detailed computer work with a high reliance on visuoperceptual and visuospatial skills would be too difficult for her."

Dr. Tracy's report and the MRI were both provided to Dr. Klazmer. In a letter dated January 23, 2003, Dr. Klazmer documented that neurologic examination "showed evidence of subjective right superior quadrant visual field loss in both eyes." He indicated that the MRI showed "an area of abnormal signal in the left occipital lobe consistent with a chronic infarction" and subcortical white matter hyperintensities. With regard to Dr. Tracy's report, Dr. Klazmer related that he had spoken to Dr. Tracy, who

conveyed that Hunter

> shows visual processing impairment along with subtle difficulties using her right hand, memory problems and findings suggestive of depression. He feels the neuropsychological impairments noticed on her recent testing are in par and essentially unchanged from her initial neuropsychological evaluation that was performed on July 1, 1996 by Dr. Roderick Hafer.

Dr. Klazmer opined that

> Florence Hunter, in summary, is status post a left occipital hemorrhage, probably from eclampsia with residual cognitive impairment that has not improved. In my opinion, this precludes her from returning to work in her former capacity and will impair her ability to obtain any type of commensurable employment for which she was reasonably qualified.

Kemper had peer reviews conducted after Hunter filed her appeal by Dr. Superfine, an internist, Dr. Goldberg, a neurologist, Dr. Epstein, an ophthalmologist, and Dr. Carpenter, a psychologist. Neither Optometrist Suscavage's report nor the MRI report were provided to Kemper until May of 2003. As a result, the peer review physicians did not have the opportunity to review that evidence. But they did review the reports of Dr. Liu, Dr. Klazmer, and Dr. Tracy. The peer review physicians generally opined that the data submitted failed to substantiate a functional impairment precluding Hunter from working either part or full-time.

After Optometrist Suscavage's records and the MRI were submitted to Kemper, it provided the documents to Dr. Goldberg to supplement his peer review report. Dr. Goldberg did not alter his conclusion. He acknowledged the new evidence that Hunter had a visual field defect from 1995, but pointed out that Dr. Liu had conducted a

thorough eye examination and concluded that there was nothing to support visual field defects.

Dr. Epstein also submitted a supplemental peer review report after reviewing this additional evidence. He opined that "[f]rom an ophthalmologic standpoint, I feel that there is no objective evidence to substantiate disability, however, the visual field abnormality has not been addressed."

After consideration of all of this medical documentation, the BRC denied Hunter's appeal. The BRC cited the Plan's definition of total disability and the Plan's provision which allows an award of benefits only when the "Administrator has received . . . information sufficient . . . to determine in its sole and exclusive discretion that a Disability exists." The BRC explained that it upheld the denial based "on all the information submitted, including Kemper's peer physician reviews." The BRC emphasized that it had to assess whether Hunter was disabled as to "all occupations beginning on 12/01/02." The BRC expressed its regret that the decision was unfavorable, but it reiterated that the Plan is "specific regarding the requirement of significant objective findings that a functional impairment exists that would preclude a covered employee from engaging in any substantially gainful activity, part-time or full-time . . . and this requirement was not met in this case."

This ERISA action followed. Cross-motions for summary judgment were filed after discovery closed. The District Court applied a heightened standard of review,

concluded the BRC's decision was arbitrary and capricious, and granted summary judgment in favor of Hunter. FedEx filed a timely appeal.

II.

Because we are reviewing a grant of summary judgment, our review is plenary. *Smathers v. Multi-Tool Inc*, 298 F.3d 191, 194 (3d Cir. 2002). In addition, because this is an ERISA claim, we must determine the level of scrutiny appropriately employed in reviewing FedEx's decision to terminate Hunter's LTD benefits. FedEx contends that the District Court erred in applying the heightened arbitrary and capricious standard of review. We agree.

In *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court instructed that the deferential arbitrary and capricious standard of review applies if an ERISA plan gives the administrator discretionary authority to determine the eligibility for benefits or to construe the terms of the plan. *Id.* The *Bruch* Court observed that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Id.*

In *Pinto v. Reliance Standard Life Insurance Company*, 214 F.3d 377 (3d Cir. 2000), we held that an insurer who both funded and administered an ERISA plan had a conflict of interest that "warrant[ed] a heightened form of the arbitrary and capricious standard of review." *Id.* at 378. *Pinto* distinguished between insurance companies that

10

both fund and administer a plan, and employers that both fund and administer a plan, recognizing that the heightened standard need not be applied to an employer who both funds and administers a plan unless the employee demonstrates that the employer's exercise of discretion may have been tainted. *Pinto*, 214 F.3d at 387-388.

In *Pinto*'s wake, we have not been hesitant to apply a heightened standard of review to an employer who both funds and administers its ERISA plan where the evidence demonstrates a reason to question the employer's impartiality. For example, in *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 198 (3d Cir. 2002), we concluded that the heightened arbitrary and capricious standard should have been applied because the employer would sustain direct financial harm if the claim was paid. In *Kosiba v. Merck & Company*, 384 F.3d 58 (3d Cir. 2004), we recognized that a financial conflict of interest was not the only cause for heightened review. We explained that our precedents also established that such review may be warranted if there is a "demonstrated procedural irregularity, bias or unfairness in the review of the claimant's application for benefits." *Id.* at 66. There, the evidence unequivocally demonstrated that the employee had total disability, yet the employer intervened in the appeal by seeking an independent medical examination, even though its insurance administrator had not. We concluded that this procedural irregularity warranted more stringent scrutiny than the deferential arbitrary and capricious standard of review. *Id.* at 68. In the absence of a financial conflict or a procedural irregularity, however, we have found that it was error to employ the

11

heightened standard of review to an employer's decision. *Vitale v. Latrobe Area Hosp.*, 420 F.3d 278, 283 (3d Cir. 2005).

Thus, we must determine whether the District Court's application of the heightened standard of review was warranted in light of the fact that FedEx is an employer and not an insurance company. We conclude after careful review of the record that FedEx, even though it both funds and administers its Plan, did not have a financial conflict of interest inasmuch as it qualified as the "typical employer" described in *Pinto*. 214 F.3d at 388. Its contributions to the Plan were actuarially grounded and irrevocably made to the Trust Fund. The assets of the Trust were used exclusively for the payment of benefits under the Plan and administrative costs. In the event the Trust was unable to pay benefits due under the Plan, FedEx was under no obligation to make up the shortfall. *Pinto*, 214 F.3d 388. Moreover, FedEx had contracted with Kemper to initially process its claims. *Kosiba*, 384 F.3d at 61. Indeed, Hunter did not contend that a financial conflict of interest existed.

Instead, Hunter asserted that heightened review was warranted because of procedural anomalies. We find no basis for concluding that there was a procedural irregularity, as in *Kosiba*, which would justify application of the heightened arbitrary and capricious standard of review. As the District Court pointed out in its memorandum, Hunter did not "allege that FedEx failed to comply with Plan procedures."

Accordingly, in the absence of a financial conflict of interest or a procedural

12

irregularity, FedEx's decision to terminate Hunter's LTD benefits should have been reviewed under the deferential arbitrary and capricious standard. For that reason, we conclude that the District Court erred by applying the heightened arbitrary and capricious standard of review.

### III.

Ordinarily, we would remand to allow the District Court to apply the correct standard of review. Remand is unnecessary, however, because the District Court concluded that the BRC's decision was "so flawed that it could not stand even if we had applied the highly deferential 'arbitrary and capricious' standard."

"Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (quoting *Adamo v. Anchor Hocking Corp.*, 720 F.Supp. 491, 500 (W.D. Pa. 1989)). "This scope of review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" *Abnathya*, 2 F.3d at 45 (quoting *Lucash v. Strick Corp.*, 602 F.Supp. 430, 434 (E.D. Pa. 1984)).

We conclude that the District Court also erred in applying, in the alternative, the deferential arbitrary and capricious standard of review. The BRC terminated Hunter's LTD benefits because the objective evidence she submitted did not demonstrated that she

13

had a physical impairment that precluded her from engaging in any substantially gainful activity on either a part-time or full-time basis. The District Court concluded that the BRC's determination was not supported by substantial evidence because Hunter had submitted objective evidence, namely Dr. Suscavage's 2002 progress notes, the 2002 MRI test result, and Dr. Tracy's report. Yet neither Dr. Suscavage's notes, including the visual field test result, nor the MRI, explained how their findings affected Hunter's current ability to function and engage in substantial gainful activity. Although Dr. Tracy's report explained that Hunter was limited in her ability to function, he opined that she was unable to perform her previous managerial position with FedEx. Hunter's inability to perform her previous work with FedEx, however, did not establish that she had a total disability as defined by the Plan.

In addition, the District Court further explained that the BRC's decision was deficient because it relied on the opinions of its peer review physicians, who accorded more weight to Dr. Liu's report than to the MRI test result and Dr. Suscavage's visual field test. Although the District Court may have concluded that the visual field test result should trump the opinion of Dr. Liu, a reviewing court may not substitute its judgment for that of the BRC. *Abnathya*, 2 F.3d at 45. Rather, it must determine if the BRC's decision was without reason or unsupported by substantial evidence. In our view, it was not unreasonable for the BRC to accord more weight to the opinion of a medical doctor, who specializes in neurology and ophthalmology at a major university hospital and who

14

based his opinion on his physical examination of the patient, than to a test result obtained by an optometrist that is unaccompanied by any explanation regarding how the test's findings limit that patient's ability to function.

Nor do we find the decision to terminate benefits suspect because it occurred several years after benefits had been awarded. It is not uncommon for benefit plans to periodically review a beneficiary's status. Here, the initial steps to investigate Hunter's continued eligibility occurred only after Dr. Perlson opined that she could work on a less than full time basis as long as she was not required to read.

In sum, the District Court did engage in a thorough review of the medical evidence. Application of the deferential standard of review, however, establishes that the BRC's decision to terminate Hunter's LTD benefits was not arbitrary and capricious. We will reverse the judgment of the District Court. We will remand to the District Court with the direction that it vacate the judgment in favor of Hunter and enter judgment in favor of FedEx.