L. Eugene DANIELS, Plaintiff,

v.

**ANCHOR HOCKING CORPORATION and Anchor Hocking Group Insurance Place, Defendants.**

**Civ. A. No. 86–478.**

United States District Court, W.D. Pennsylvania.

Feb. 27, 1991.

Mark Homyak, Pittsburgh, Pa., for plaintiff.

Henry Wallace, Pittsburgh, Pa., for defendants.

## OPINION

D. BROOKS SMITH, District Judge.

Plaintiff L. Eugene Daniels is a former management employee of defendant Anchor Hocking Corporation's ("Anchor") Shenango China Division. He began his career with Shenango China in 1964, and while employed there saw several changes in management. In 1979, defendant Anchor acquired Shenango China, and continued to employ plaintiff as the Vice President of Manufacturing.

In June 1982, Anchor transferred plaintiff to a new position. In 1983, Anchor again changed plaintiff's title and reduced his salary by 21.6%. Defendant characterizes this change as a demotion; plaintiff contends that his reduction in salary was part of a company-wide scheme to eliminate overhead in upper and middle management. On August 31, 1985, Anchor terminated plaintiff's employment.

On March 3, 1986, plaintiff filed this suit. In his complaint, plaintiff alleged that defendants violated Section 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001 *et seq.*, by denying him severance pay and health benefits as provided in Anchor's Personnel Policy No. 2–10–1, Severance,

Layoff, and Recall Procedures for Salaried Employees. ("Severance Policy"). Defendant filed an answer in which it claims that it did not violate the terms of the severance policy by denying plaintiff benefits because plaintiff was not eligible for benefits under the terms of the plan.

The case is now before the Court on defendant's motion for summary judgment. Plaintiff contests this motion for summary judgment by claiming that there are genuine disputes as to material facts that preclude granting summary judgment. Defendants respond that the only disputed facts are not material to the ultimate question of plaintiff's eligibility for severance benefits. We agree and therefore grant defendants' motion.

Rule 56 of the Federal Rules of Civil Procedure allows a party to obtain summary judgment upon a showing that there are no genuine issues of material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is not "regarded as a disfavored procedural shortcut but rather as an integral part of the Federal Rules ..." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). When reviewing a motion for summary judgment, we must view the evidence in the light most favorable to the nonmoving party. *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir. 1983). However, the nonmoving party must produce more than a mere scintilla of evidence to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 262, 106 S.Ct. 2505, 2517, 91 L.Ed.2d 202 (1986). Indeed, Rule 56(c) states that the nonmoving party "must set forth facts showing that there is a genuine issue for trial." Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be a *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The substantive law governing the case controls which facts are material. *Ibid.* Similarly, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* 477 U.S. at 255, 106 S.Ct. at 2514. With these principles in mind, we turn to the merits of the instant case.

■ The threshold issue which confronts us concerns the standard of review. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that a denial of benefits "is to be reviewed under a *de novo* standard of review unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956. The Supreme Court did not, however, specifically articulate the standard of review to be applied by courts reviewing decisions made under discretionary plans. After *Bruch,* this court held that "[i]n the event a plan gives an administrator or fiduciary discretion to determine eligibility or construe uncertain terms, an arbitrary and capricious standard will apply." *Adamo v. Anchor Hocking Corp.,* 720 F.Supp. 491, 499 (W.D.Pa.1989). *See also Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 119 (3d Cir.1990) (holding that where a plan grants an administrator discretion in making eligibility determination, a court must review that determination under the arbitrary and capricious standard.)

The plan at issue in the instant case is the same plan that was at issue in *Adamo, supra.* In *Adamo,* this Court concluded that the plan "clearly grants the administrator the power to construe uncertain terms. As a matter of law, therefore, the severance plan is discretionary and an arbitrary and capricious standard must be applied." *Id.* 720 F.Supp. at 499. The parties here agree that the plan vests the administrator with discretion to construe uncertain terms and to make decisions concerning eligibility. The parties disagree, however, as to the applicable standard of review. Defendant contends that because the plan grants the administrator discretion, the administrator's decision cannot be overturned unless it is arbitrary and capricious. Plain-

tiff, however, contends that the Supreme Court's decision in *Bruch* mandates review under an abuse of discretion standard because the plan is unfunded and the administrator operates under an inherent conflict of interest.

We find plaintiff's argument untenable for several reasons. First, plaintiff has not provided the Court with any explanation as to how the arbitrary and capricious standard is different from the abuse of discretion standard. Nor does plaintiff provide the Court with any statement of the analytical framework mandated by either standard of review. Instead, plaintiff perfunctorily asserts, without citation or explanation, that the arbitrary and capricious standard is narrower than the abuse of discretion standard. Defense counsel has also failed to squarely address this issue; he simply relies on this Court's statement in *Adamo* that the decision must be reviewed under the arbitrary and capricious standard.

The briefs and arguments in this case have not convinced the Court that there is a meaningful difference between the arbitrary and capricious standard and the abuse of discretion standard. However, because of its importance, we consider it necessary to address this issue at length.

Unfortunately even in the post-*Bruch* cases which discuss the standard of review, there is little explication of the analytical framework to be employed when applying the arbitrary and capricious standard as compared to the abuse of discretion standard. Indeed, there is even a line of cases from the Eleventh Circuit under which the labels "abuse of discretion" and "arbitrary and capricious" are used interchangeably. *Anderson v. Blue Cross & Blue Shield of Alabama*, 907 F.2d 1072, 1075 n. 2 (11th Cir.1990); *Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556, 1558 n. 1 (11th Cir. 1990), *cert. denied*, — U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701, (1991); *Jett v. Blue Cross & Blue Shield*, 890 F.2d 1137, 1139 (11th Cir.1989). However, this view is not universally held.

According to the United States Court of Appeals for the Seventh Circuit, a court reviewing a denial of benefits must employ the arbitrary and capricious standard even if the plan administrator operates under a conflict of interest. *Rizzo v. Caterpillar, Inc.*, 914 F.2d 1003, 1008 and n. 2 (7th Cir.1990). In contrast, the Fourth Circuit has held that *Bruch* mandates the total abandonment of the arbitrary and capricious standard regardless of the existence of a conflict of interest. *DeNobel v. Vitro Corp.*, 885 F.2d 1180, 1185–1186 (4th Cir. 1989). Thus, no consensus has emerged from the post-*Bruch* cases as to the applicable standard of review where a plan grants discretion to an administrator who is operating under a conflict of interest. Nor do these divergent precedents provide any clear explanation of the differences between the arbitrary and capricious and the abuse of discretion standards of review.

Without a statement from the Court of Appeals for the Third Circuit, or any clear consensus among the other Courts of Appeals, we write on a clean slate. We disagree with plaintiff's contention, and we decline to follow the Fourth Circuit's conclusion, that the Supreme Court's opinion in *Bruch* can be read as a wholesale rejection of the arbitrary and capricious standard.

In *Bruch*, the Supreme Court stated that comparison between the Labor Management Relations Act and ERISA "shows that the *wholesale* importation of the arbitrary and capricious standard into ERISA is unwarranted." 489 U.S. at 109, 109 S.Ct. at 953 (emphasis in the original). The Court then held that *de novo* review is appropriate *in the absence* of plan language granting discretion to the administrator. The Court did not identify the standard to be applied in plans that vest discretion in the plan administrator. Instead, the actual language of the opinion referred to the proper standard for nondiscretionary plans. We do not believe that the Supreme Court intended the wholesale rejection of the arbitrary and capricious standard. The *Bruch* opinion simply does not compel this conclusion. *See Rizzo v. Caterpillar, Inc.*, 914 F.2d at 1008 and n. 2. (noting that the

Supreme Court did not specify the proper standard of review where the plan grants the administrator discretion and remanding the case, which involved a discretionary plan, to be reviewed under an arbitrary and capricious standard).

Finally, we reject plaintiff's contention that when a plan administrator is working under a conflict of interest, the abuse of discretion standard is appropriate. Plaintiff relies on language from the Supreme Court's *Bruch* opinion which states "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Bruch*, 489 U.S. at 115, 109 S.Ct. at 956 *quoting* Restatement (Second) of Trust § 187, comment d (1959). We do not agree with plaintiff's argument that this statement actually changes the appropriate standard of review. In the discussion preceding the language upon which plaintiff relies, the Supreme Court states that it "did not rest [its] decision on the concern for impartiality that guided the Court of Appeals ... [and therefore] [did not need] to distinguish between types of plans or focus on the motives for plan administrators." 489 U.S. at 115, 109 S.Ct. at 956. The clear import of this language is that the terms of the plan document, rather than a possible conflict of interest, controls the standard of review.

Moreover, we find that the manner in which *Bruch* is written supports the Eleventh Circuit's conclusion that "abuse of discretion" and "arbitrary and capricious" are terms that may be used interchangeably. We believe that the Supreme Court's reference to "abuse of discretion" was the result of its attempt to give lower courts guidance in reviewing administrator's decisions by reference to trust law (where "arbitrary and capricious" is not a term of art), rather than a deliberate decision to change the applicable standard of review. We believe that a more accurate interpretation of *Bruch* leads to the conclusion that the alleged conflict of interest becomes a

*factor* to be considered and given some weight during the review process, rather than changing the substantive nature of the review itself. Thus, we conclude, as we did in *Adamo*, that defendant's decision must be reviewed under the arbitrary and capricious standard of review.

 Under the arbitrary and capricious standard, the administrator's decision cannot be disturbed if reasonable. *Adamo v. Anchor Hocking Corp.*, 720 F.Supp. at 499 *relying* on *Bruch*, 489 U.S. at 111, 109 S.Ct. at 954; *Jett v. Blue Cross*, 890 F.2d at 1139. Our first inquiry, then, must be into the administrator's interpretation of the plan language which states that "[t]he purpose of this policy is to provide compensation to those employees who are terminated *through no fault of their own.*" (Personnel Policy and Procedure, ¶ 1) (emphasis added). The plan does not provide any further definition of the language through "no fault of their own." However, the plan does delineate two situations in which severance would be available. According to the plan, severance pay is available in the event of a temporary or permanent lay off. The plan defines both these terms as a termination of employment as the result of a company decision to eliminate the employee's job. Defendants interpret this language to mean that "employees terminated through *some* fault of their own are ineligible for severance benefits." (Defendant's Brief at 12) (emphasis in the original). We do not think this interpretation is unreasonable. Indeed, when this same plan was reviewed in *Adamo*, this Court found that the administrator's interpretation of this language to encompass "layoffs, reduction of force and those limited circumstances in which an employee loses his job for reasons totally unrelated to the performance of his job ..." was reasonable. *Adamo*, 720 F.Supp. at 499. The administrator's interpretation that those employees who are terminated because of some fault of their own are not entitled to benefits under the plan is entirely reasonable.[1]

---

**1.** Plaintiff contends that to be ineligible for benefits under the plan, an employee must be ter-

Finally, we do not believe, nor does plaintiff argue, that this interpretation is tainted by any conflict of interest. Indeed, such an argument could not be supported. The plan is written in fairly narrow terms and explicitly limits severance pay and benefits to those employees who are "terminated through no fault of their own." The explicit nature of this language, together with the plan's focus defining what constitutes a "layoff", precludes any suggestion that the administrator's interpretation unduly narrows the boundaries of eligibility in any attempt to preserve the defendants' fund. Thus, even after considering the potential conflict of interest, we find the defendants' interpretation to be reasonable.

We must now review the administrator's decision that plaintiff was ineligible for benefits under the plan. We must affirm the administrator's decision unless it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Adamo*, 720 F.Supp. at 500, *quoting Jung v. FMC Corp.*, 755 F.2d 708, 711 (9th Cir.1985). The administrator's decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision. Significantly, however, the evidence need not obscure all other possible conclusions. Our task as a reviewing court is to determine first, whether the administrator considered all the relevant factors, and second, whether the decision constituted a clear error of judgment. *Wolf v. National Shopmen Pension Fund*, 728 F.2d 182, 187 (3d Cir. 1984). Thus, unless the decision was not rational, we must uphold the administrator's decision. *Shiffler v. Equitable Life Assurance Society*, 838 F.2d 78, 83 (3d. Cir.1988).[2]

In their motion for summary judgment, defendants contend that plaintiff was terminated because his job performance was unsatisfactory. Defendants therefore argue that plaintiff was ineligible for benefits because he was terminated for cause or through his own fault. As discussed above, under the terms of the plan, if defendant terminated plaintiff due to some fault of plaintiff, then plaintiff is ineligible for benefits. Plaintiff argues in response that he was terminated through no fault of his own and that his job was eliminated due to a company wide reduction in force. After reviewing the record, we find that there is substantial evidence to support the administrator's conclusion that plaintiff was terminated for fault, and we therefore affirm the denial of benefits.

The uncontradicted evidence shows that beginning in July 1982, plaintiff was demoted from the position of Vice President of Manufacturing to Manager of Manufacturing Engineering. On June 1, 1983, plaintiff was again demoted to the position of Director of Manufacturing. This demotion involved a 21% reduction in salary. Prior to this demotion, Robert H. Horn, Vice President and General Manager of defendant's food service division sent plaintiff a memo in May 1983 regarding his change in position. In that memo, Horn informed plaintiff that his job had been eliminated as part of "general restructuring of Shenango management" to "eliminate overhead in middle and upper management." (Plaintiff's Ex. H, at 1) Horn further informed plaintiff that he could either retire or accept a new position. Horn cautioned plaintiff that the new position involved "many unusual and special projects to be accomplished at Shenango over the

minated for "affirmative misconduct or incompetence." (Plaintiff's Brief at 7) This is roughly equivalent to the for-cause or "fault" standard articulated by defendants. As is discussed *infra*, plaintiff is ineligible for benefits under this standard because he was not performing his job satisfactorily and was thus, incompetent.

2. The analysis mandated by the arbitrary and capricious standard of review is virtually identical to the abuse of discretion standard of review used by courts reviewing the decisions of ad-

ministrative agencies. Indeed, in the administrative context, the boundaries between the abuse of discretion standard and the arbitrary and capricious standard are not well defined. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 407, 414–417, 91 S.Ct. 814, 819, 822–24, 28 L.Ed.2d 136 (1971). This supports our conclusion, as well as the conclusions of the Eleventh and Seventh Circuits, that *Bruch* did not change the standard of review applicable to discretionary plans.

next several years." *Id.* The memo also indicated that plaintiff's problems in dealing with personnel matters "precluded [him] from being considered for the position of Vice President of Operations." (Plaintiff's Ex. H at 2) The memo concluded: "There are no contracts at Anchor Hocking, Gene, and your future employment is dependent upon your ability to perform the job . . ." *Id.* Plaintiff chose to accept the new position rather than retire.

In May, 1984, James C. Bergman, Vice President of Operations, completed a written appraisal of plaintiff's performance. (Defendant's Answers to Interrogatories, Ex. E) Bergman gave plaintiff an overall rating of 3.66 points out of a possible 5 points. Plaintiff's rating fell somewhere between "satisfactory" and "commendable". Bergman indicated that plaintiff had used his practical experience to offset his lack of technical knowledge. Finally, Bergman's assessment of plaintiff's promotability was equivocal; Bergman indicated that plaintiff "appeared to have the potential for eventual promotion, but additional experience and development are needed." (Ex. E at p. 18).

The May 1984 appraisal set forth specific areas of responsibility and job objectives upon which plaintiff's performance was evaluated. A full 80% of these job objectives were subsumed in five technical areas which included: dry pressing program, plant modernization, ceramic engineering, industrial engineering and other engineering projects. (Ex. E at 16, 18) Plaintiff's overall score when limited to these 5 technical areas fell to 3.62. Indeed, the May 1984 evaluation indicated that the dry-pressing program was 3 months behind schedule and that there were significant problems with the projects under the heading of other engineering projects.

The progress of these projects slowed significantly after the 1984 evaluation. Both parties agree that at the time of plaintiff's termination, production on the dry press operation was 18 months behind schedule. (Timberlake Depo. at 57). There were similar problems with the installation of a new fast fire kiln. When the new kiln was installed, David A. Timberlake, then Vice President and General Manager of the Food Service Division, wanted to keep both kilns operational as a "safety valve . . . in case something happened." (Timberlake Depo. at 62). However, upon the advice of plaintiff, Timberlake agreed to shut down the older kiln. Unfortunately, there were major operational problems with the new fast fire kiln which resulted in "tremendous product losses" and prevented delivery to waiting customers. (*Id.* at 61).

Plaintiff also had significant performance problems in other areas. One of his duties as director of engineering was new product development. According to Timberlake, no new products were developed. (Timberlake Depo. at 45–49). Plaintiff was also responsible for overseeing the use of an industrial robot. Anchor purchased the robot to increase the efficiency of production by streamlining the process for decorating the china. However, the robot did not prove to be efficient. On the contrary, it required more people to use the robot than to decorate the china by hand. Timberlake brought this problem to the attention of plaintiff on several occasions, but plaintiff continued to operate the robot. Finally, as a result of Timberlake's third or fourth request, plaintiff discontinued use of the robot. (Timberlake Depo. at 26, 65–66). Plaintiff's last major fault was failing to create an incentive program to enhance the productivity of hourly workers. (*Id.* at 31). Both James Bergman, plaintiff's supervisor, and Lou Harris, an independent consultant, brought this problem to Timberlake's attention. (*Id.*)

Defendants claim that the above mentioned deficiencies in plaintiff's performance caused plaintiff's termination. Plaintiff does not deny that these production problems occurred during his final year of employment. Instead, plaintiff attempts to argue that even though production was slowed due to numerous engineering problems, he did not cause these production problems, they were not his fault, and he was therefore terminated through no fault of his own. Thus, he attempts to argue there are genuine issues of material fact

that preclude granting defendant's motion for summary judgment. We find plaintiff's arguments to be without merit.

Plaintiff sets forth several "facts" to support his argument that defendant's decision to terminate him was arbitrary and capricious because it is not supported by substantial evidence. These "facts" fall roughly into two categories of arguments. Plaintiff argues that "Timberlake misrepresented the state of Daniel's performance," (Brief for Plaintiff at 12), and that defendant treated plaintiff in a manner that was inconsistent with the manner in which other employees were treated. However, the facts upon which plaintiff relies do not undermine the decision of the administrator. Indeed, many are not even relevant enough to create genuine issues of *material* fact. We will address each argument seriatim.

Plaintiff contends that many of the mechanical problems were not "his fault" and therefore it was arbitrary and capricious for defendant to conclude that he was terminated for cause and, therefore, not entitled to benefits. For example, plaintiff contends that he did not cause the problems associated with the fast fire kiln. He claims that the kiln itself was defective and that defendant is contemplating legal action against the manufacturer. (Plaintiff's brief at 4, Perillo Depo. at 25). Even though we assume the truth of plaintiff's allegation that the kiln was defective, this does not change the fact that plaintiff exercised poor judgment when he chose to take the older, functioning kiln out of operation before ascertaining the operational capacity of the new kiln. The end result of plaintiff's decision was a significant decrease in production. Thus, notwithstanding plaintiff's good faith intentions, his decision caused defendant great losses.

Plaintiff's reliance on his earlier performance evaluations is similarly misplaced. Even if the Court were to find that plaintiff's July 1983 demotion was the result of a need to reduce overhead, that employment action was not related to plaintiff's later dismissal. As indicated above, at the time of his demotion, plaintiff was given the option to take early retirement and its benefits, or to accept a new position involving substantial and challenging responsibilities. At the time defendant presented this option to plaintiff, defendant also informed plaintiff that his continued employment would be dependent upon job performance. Plaintiff chose to accept the new position. Thus, even if the Court found his prior job had been eliminated, plaintiff accepted a new job that involved new responsibilities and no guarantees of job security and thus would not be entitled to benefits under the terms of the plan.

■ Similarly, the fact that the plaintiff received a positive evaluation more than a year before his termination does not make the decision to deny benefits arbitrary and capricious. As discussed above, the record demonstrates that production problems grew significantly worse after that evaluation was completed. Second, and perhaps more importantly, we do not find that this evaluation was quite as positive as plaintiff contends it was. The evaluation noted that there were production problems that needed to be corrected. Moreover, plaintiff's evaluator indicated that although plaintiff had compensated for his lack of technical knowledge with his practical experience, plaintiff would need additional experience or training before he could be promoted. Thus, there was some indication that problems might arise in the future.

Plaintiff's further contention that he was treated differently than other employees is similarly flawed. According to plaintiff, he is not relying on "defendants' purported written severance pay policy" but on an unwritten policy to award benefits in the absence of incompetence or affirmative misconduct. (Plaintiff's Brief at 14). Plaintiff, however, has not produced any evidence, either in the form of corporate memoranda or testimony, to support this contention. Moreover, even if the Court assumed that plaintiff was correct in this conclusion, plaintiff's conduct with regard to the fast fire kiln and the industrial robot would certainly fall under the category of incompetence. Indeed, the personnel forms completed during the separation pro-

cess indicate that Anchor would need to hire a person with a more technical background to fill the job.[3]

Plaintiff also contends that the administrator's decision to terminate him was arbitrary and capricious because he had consistently received high performance ratings. According to plaintiff, other employees who earned high ratings received severance pay, and those who earned low ratings or were involved in theft did not receive severance pay. (*See* Plaintiff's Brief at 15) The record, however, does not support this argument. As discussed above, plaintiff's last performance appraisal was completed more than a year before he was terminated and thus does not provide an accurate basis for comparison. Similarly, any previous performance ratings are totally irrelevant as they are evaluations of plaintiff's ability to perform the tasks involved in different positions.

Plaintiff does proffer one document which he contends supports his position. However, there are several problems with this document. First, the source of the document is totally unclear. It is not on the defendants' letterhead, nor does plaintiff offer any explanation as to the source of the document. There is no affidavit purporting to verify its accuracy or authenticity. Second, as a substantive matter, the document itself has little persuasive value. It is merely a listing of names and performance ratings divided into two categories: those who received severance pay and those who did not. Significantly, there is not a great deal of difference in the performance ratings of the terminated employees. Indeed, some of the individuals who received severance pay had lower ratings than those who did not. Plaintiff does not offer further explanation as to why defendant terminated these employees. Without the benefit of such an explanation, the Court cannot find that this unverified, unauthenticated list of numbers creates a genuine issue of material fact as to whether plaintiff was treated so differently as to make the administrator's decision to deny severance pay arbitrary and capricious.

■ The last factor this Court must consider in deciding whether the administrator's decision was arbitrary and capricious is the potential conflict of interest faced by the administrator. Despite plaintiff's assertion that this conflict of interest is of critical importance, he does not explicitly claim that any potential conflict of interest tainted the administrator's decision. Nowhere does plaintiff explicitly argue that the administrator's desire to preserve the defendants' funds motivated the administrator's decision to deny him severance pay.

Indeed, the record and plaintiff's own arguments would refute such a contention. Plaintiff alleges that it was past practice to grant all highly rated employees, such as himself, severance benefits unless they were guilty of incompetence or affirmative misconduct. He argues that the administrator awarded benefits to some employees whose performance was on par with his own. If this were in fact the case, plaintiff cannot also argue that the administrator's denial of benefits was in bad faith and motivated by a desire to preserve the funds of the defendants.

The only argument the plaintiff makes that even vaguely resembles an argument based on allegations of bad faith or a conflict of interest involves Timberlake. Specifically, plaintiff contends that Timberlake was too ignorant of the china production business to make a reasonable decision. This argument, however, fundamentally misconstrues the *raison d'etre* for the conflict of interest analysis. The conflict of interest analysis only recognizes that the plan may improperly seek to minimize payments and thereby render the termination of eligibility tainted by self-interest. *See*

---

**3.** Plaintiff relies on this statement to support his contention that his job was eliminated. Such reliance is misplaced. This statement does not demonstrate that plaintiff's job was eliminated, but that plaintiff did not have the skills, and therefore was incompetent to do the job. In fact, fairly read, we believe that this statement indicates that defendants had no intention of eliminating the job and were attempting to set guidelines that would enable them to find a better candidate for plaintiff's former position.

*Egert v. Connecticut General Life Ins. Co.*, 900 F.2d 1032, 1035 (7th Cir.1990). *Anderson v. Blue Cross, supra,* 907 F.2d at 1076 *quoting Brown v. Blue Cross,* 898 F.2d at 1561–62. We have found nothing in the record to support a contention that the administrator denied benefits to plaintiff in order to preserve funds. Moreover, even assuming *arguendo* that the administrator was motivated by an improper conflict of interest, the overwhelming evidence of plaintiff's incompetence and poor judgment would provide the administrator with ample evidence to deny the plaintiff, in good faith, the subject benefits.

In conclusion, we grant defendants' motion for summary judgment because we find that the terms of the plan provided severance benefits only to employees who lost their jobs due to a reduction in force or because their jobs were totally eliminated. The plan did not provide severance pay for employees who were terminated for cause. We further find that there is substantial evidence to support the administrator's conclusion that defendant terminated plaintiff's employment because of his unsatisfactory job performance. Plaintiff's attempt to show that this decision was arbitrary and capricious was utterly unpersuasive as the evidence upon which plaintiff relied created no genuine issues of material fact. We therefore grant defendants' motion for summary judgment.

An appropriate order will be entered

### ORDER

AND NOW, this 27th day of February, 1991, it is hereby

ORDERED, that defendant's motion for summary judgment is GRANTED. It is further

ORDERED, that the case is DISMISSED and the Clerk is directed to mark this case CLOSED.