

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-31-2000

# Courson v. Bert Bell Pension Plan & NFL

Precedential or Non-Precedential:

Docket 99-3279

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

## Recommended Citation

"Courson v. Bert Bell Pension Plan & NFL" (2000). *2000 Decisions.* Paper 112.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/112

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 31, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3279

STEPHEN P. COURSON,
      Appellant

v.

BERT BELL NFL PLAYER RETIREMENT PLAN; BERT
BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN;
BERT BELL NFL PLAYER RETIREMENT TRUST; BERT
BELL NFL PLAYER RETIREMENT TRUSTEE; BERT BELL
NFL PLAYER RETIREMENT BOARD; BERT BELL/PETE
ROZELLE NFL PLAYER RETIREMENT BOARD; THE NFL
PLAYER SUPPLEMENTAL DISABILITY PLAN; THE NFL
PLAYER SUPPLEMENTAL DISABILITY PLAN DISABILITY
BOARD; THE NFL PLAYER SUPPLEMENTAL DISABILITY
PLAN TRUST; THE NFL PLAYER SUPPLEMENTAL
DISABILITY PLAN TRUSTEES; THE PLAN DIRECTOR;
DOES 1 THROUGH 110, Inclusive

Appeal from the United States District Court
for the Western District of Pennsylvania
(D. Civ. No. 97-cv-02366)
District Judge: Honorable Robert J. Cindrich

Argued
March 21, 2000

Before: MANSMANN, GREENBERG and ALARCON,*
Circuit Judges.

(Filed: May 31, 2000)

_____

* Honorable Arthur Alarcon of the United States Court of Appeals for
the Ninth Circuit, sitting by designation.

        Philip J. Murray, III, Esquire
          (ARGUED)
        C. James Zeszutek, Esquire
        Daniel A. Dzialga, Esquire
        Thorp, Reed & Armstrong
        One Riverfront Center
        Pittsburgh, PA 15222

          COUNSEL FOR APPELLANT

        Thomas S. Gigot, Esquire (ARGUED)
        Douglas W. Ell, Esquire
        Alvaro I. Anillo, Esquire
        Groom Law Group Chartered
        1701 Pennsylvania Avenue, N.W.
        Suite 1200
        Washington, D.C. 20006

          COUNSEL FOR APPELLEES

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal, we are asked to decide whether the decision of the Retirement Board for the National Football League's retirement plans, denying a request to reclassify disability benefits to a higher pay status, was arbitrary and capricious. Stephen P. Courson contends that the NFL and its member teams condoned and/or supervised, inter alia, his abuse of alcohol for pain relief and, therefore, his alcohol-induced cardiomyopathy arose from a "League football activity" within the meaning of the retirement plan. Thus, Courson contends he is entitled to a higher level of disability benefits. Because we find the Board's decision was reasonable and supported by substantial evidence, we will affirm the judgment of the District Court.

I.

This appeal presents the unfortunate account of a former professional football player who once dominated the playing field as an offensive lineman in the National Football

League ("NFL") but, due to alcohol-induced cardiomyopathy, is now in need of a heart transplant. In 1977, Courson was drafted by the Pittsburgh Steelers Football Club. Courson played professional football for the Steelers from the time he was drafted in 1977 until the end of the 1983 season. He was traded to the Tampa Bay Buccaneers Football Club in 1984 and played for that team during the 1984 and 1985 seasons. After the conclusion of Tampa Bay's 1986 mini-camp, Courson asked to be traded. Tampa Bay agreed and released him two weeks later. Courson then spent the next month in Myrtle Beach, working out with weights and running every day to stay in physical condition in the expectation that another NFL team would express an interest in him. No other team called, however, and in September 1986, Tampa Bay officially announced Courson's retirement from football.

After officially retiring from football, Courson took the first fall vacation of his life--he flew to Munich for Oktoberfest. Upon returning from Germany, Courson rented a cabin in Wyoming and began taking notes for his autobiography, which was eventually published in 1991 under the title, False Glory. In the spring of 1988, Courson found out he was flat broke, having lost more than $500,000 through a number of bad investments. Courson concluded that, "[o]ther than football, I didn't know of too many legitimate professions in which one could make that kind of dough. And without a college degree and with few marketable skills, it would be difficult for me to earn even a moderately decent wage." Consequently, Courson decided to pursue a career in professional wrestling. He thought he could make a lot of money fast and then retire.

In his book, False Glory, Courson describes his first match in Charleroi, Pennsylvania, in which he quickly disposed of his opponent by giving "him a couple of hip tosses, [throwing] him off the ropes, lift[ing] him, body-slamm[ing] him to the canvas, and then cover[ing] him up. Bing-bang-boom." Around the same time, Courson competed in his first and only weight lifting competition. At a September 10, 1988 event, Courson bench pressed 605 pounds to win the super-heavyweight class, describing the victory as "exhilarating."

3

During his career in the NFL, Courson was exposed to the use of anabolic-androgenic steroids ("AAS") among his teammates and other NFL players. In order to compete with other NFL players who used AAS, Courson began ingesting AAS to increase his size, strength, speed, and aggression. Courson continued to ingest AAS after he retired from the NFL.

At about the same time as he was ingesting AAS, Courson also began consuming large amounts of alcohol, primarily as a means to control the pain resulting from football injuries. According to Courson, his drinking eventually led to his addiction to alcohol because the pain remained constant yet more alcohol was needed as his tolerance level increased. Courson could have chosen narcotic painkillers, which he claims were frequently provided by team physicians, to quell his pain but, instead, he chose alcohol. Courson continued to drink excessively until he became ill in the fall of 1988.

On November 26, 1988, Courson presented himself to the hospital emergency room with complaints of shortness of breath. Following a battery of tests, the hospital's physicians concluded that Courson was experiencing heart failure and diagnosed "dilated cardiomyopathy." According to Courson, cardiologist Richard Rosenbloom, M.D., explained that his muscle fibers were being "lost over time" and that his heart had become "flabby and baggy and doesn't pump as a normal heart should." Dr. Rosenbloom immediately placed Courson on a waiting list for a heart transplant.

In October 1992, Courson applied for disability benefits under the Bert Bell NFL Player Retirement Plan (the"Bert Bell Plan" or the "Old Plan"), an employee pension benefit plan within the meaning of section 3(2)(A) of ERISA, 29 U.S.C. S 1002(2)(A). The Bert Bell Plan  was established through a collective bargaining agreement between the National Football League Players' Association ("the Players' Association") and the National Football League Management Council ("the Management Council"). The Bert Bell Plan provides the following relevant categories of benefits:

4

> 1) a monthly pension of "no less than $4,000 if disability results from a football injury incurred while an Active Player;" and

> 2) a monthly pension of "no less than $750 if the total and permanent disability results from other than a football injury;"

Bert Bell Plan, S 5.1 at p. 27. Thus, the Bert Bell Plan distinguishes between two types of benefits, "Football Injury" benefits and "Other Than Football Injury" benefits.

The Bert Bell Plan provides for the creation of a Retirement Board composed of six voting members, three of whom are selected by the Players' Association and three of whom are selected by the Management Council, and one non-voting member, the Commissioner of the NFL. With regard to the powers of the Retirement Board, the plan states:

> the Retirement Board shall have all necessary powers incident to the creation, administration, implementation and operation of the Plan and Trust, including but not limited to the power:

>  A) To define and amend the terms of the Plan  and Trust, to construe the Plan and Trust and to reconcile inconsistencies therein.

Bert Bell Plan, S 8.4(A) at p. 36.

On his application for disability benefits, Courson identified "Idiopathic Dilated Cardiomyopathy" as the nature and cause of his disability with an onset date of November 1988. His application included a report from cardiologist Mark E. Thompson, M.D., who confirmed that Courson was totally and permanently disabled and that the disability onset date was November 26, 1988. Dr. Thompson described the nature of the disability as "Idiopathic Cardiomyopathy." Dr. Thompson further indicated in his report that the disabling illness or injury did not result from a football-related activity. In December 1992, the Retirement Board awarded Courson "Other Than Football Injury" benefits under the Bert Bell Plan retroactive to December 1, 1988, the first month following the onset date of his disability.

5

In June 1993, the Players' Association and the Management Council entered into a new collective

bargaining agreement. The agreement called for the Bert Bell Plan and the Pete Rozelle NFL Player Retirement Plan (the "Rozelle Plan"), an ERISA plan similar to the Bert Bell Plan, to be merged to form a new plan, the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Player Retirement Plan" or the "New Plan"). The Player Retirement Plan, which governs eligibility determinations for benefits payable after July 1, 1993, is also an employee pension benefit plan within the meaning of section 3(2)(A) of ERISA, 29 U.S.C. S 1002(2)(A). Under the Player Retirement Plan, eligible players who had been awarded benefits under the Bert Bell Plan and the Rozelle Plan (collectively referred to as the "Predecessor Plans") will continue to receive disability benefits.

As was true for the Predecessor Plans, eligibility terms and benefit levels under the Player Retirement Plan were established through collective bargaining between the Players' Association and the Management Council and memorialized in the governing plan document. Like the Predecessor Plans, the Player Retirement Plan is administered by a joint Retirement Board composed of six voting members, three selected by the Players' Association and three selected by the Management Council. The plan document provides in pertinent part:

> [t]he Retirement Board will have full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan and the Trust. Such authority includes, but is not limited to, the power to:
>
> (a) Define the terms of the Plan and Trust, construe the Plan and Trust, and reconcile any inconsistencies therein;
>
> (b) Decide claims for benefits (except that the Retirement Board will follow decisions submitted to, and decided by, the Medical Advisory Physician or an arbitrator pursuant to Section 8.3);
>
> . . .

6

Player Retirement Plan, S 8.2 at 32.

The plan document also sets forth the following four-part classification scheme for awarding and paying total and permanent disability benefits:

(a) (Active Football) The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled "shortly after" the disability(ies) first arises.

(b) (Active Nonfootball) The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) does not result from League football activities, but does arise while the Player is an Active Player and does cause the Player to be totally and permanently disabled "shortly after" the disability(ies) first arises.

(c) (Football Degenerative) The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of the Player's last Credited Season.

(d) (Inactive) The monthly total and permanent disability benefit will be no less than $1,500 if (1) the total and permanent disability arises from other than League football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities, and results in total and permanent disability after the later of (i) age 45, or (ii) 12 years after the end of the Player's last Credited Season. The minimum benefits provided under this Section 5.1(d) will be offset by any disability benefits provided by an employer other than the League or an Employer, but will not be offset by worker's compensation.

7

Id., S 5.1(a) – (d) at 21–22. As used in subsections (a) and (b) above, the phrase "shortly after" includes Players who become totally and permanently disabled within six months after the disability first arises. If a Player becomes totally and permanently disabled more than twelve months after the disability first arises, the disability will be conclusively deemed not to fall within the "shortly after" provision. The Retirement Board is vested with the discretion to decide whether the "shortly after" standard is satisfied in cases where the Player becomes totally and permanently disabled more than six months but less than 12 months after the disability first arises. Id., S 5.1 at 22.

In addition to the minimum $4,000 benefit provided by the Active Football, Active Nonfootball, and Football Degenerative classifications, a player falling under one of these three classifications is automatically entitled to an additional monthly benefit under the NFL Player Supplemental Disability Plan (the "Supplemental Plan").1 The purpose of the Supplemental Plan is to provide additional disability benefits to certain players who also receive total and permanent disability benefits under the Player Retirement Plan. Like the Player Retirement Plan, eligibility terms and benefit levels under the Supplemental Plan are determined through collective bargaining between the Players' Association and the Management Council and memorialized in the governing plan document. The Supplemental Plan is administered by a Disability Board composed of six voting members, three of whom are selected by the Players' Association and three of whom are appointed by the Management Council. The Disability Board has absolute discretion and final authority in interpreting the Supplemental Plan, adopting rules and regulations regarding the administration of the plan, and reviewing claims for benefits. Supplemental Plan, S 4.3 at 9.

When aggregated, benefit payments under the Player Retirement Plan and the Supplemental Plan  amount to $200,000 per year for Players whose claims fall within one of these three categories. On the other hand, Players whose

---

1. The Supplemental Plan is an employee benefit plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. S 1002(1).

8

claims are classified in the Inactive category do not receive benefits under the Supplemental Plan.

Courson petitioned the Player Retirement Plan's Retirement Board in May of 1996 to reclassify his disability from Inactive to one of the three higher-paying classifications—Active Football, Football Degenerative, or Active Nonfootball. In his petition, Courson cited his use of AAS and alcohol during the years that he played in the NFL as the cause of his disabling heart condition, and that such use should be considered "League football activities" for purposes of the Player Retirement Plan's disability classification scheme.

The Retirement Board unanimously denied Courson's reclassification request under the Player Retirement Plan in a letter decision dated July 18, 1996. The Board's decision left intact Courson's current classification of Inactive for which he receives payments of $1,750 per month. The Board concluded that Courson did not qualify for either Active Football, Football Degenerative, or Active Nonfootball benefits because: (1) his disability did not arise during the time he was an Active Player; (2) even if his disability did arise during the time he was an Active Player, it did not cause him to become totally and permanently disabled within 12 months of the onset date of the disabling condition; (3) the taking of AAS and the consumption of alcohol are not League football activities; and (4) even if the taking of AAS was considered a League football activity, there is no established scientific evidence that there is a causal relationship between the use of AAS and the development of dilated cardiomyopathy.

In accordance with the decision review provisions of the Player Retirement Plan, Courson appealed the Retirement Board's denial and submitted additional documentation related to AAS and alcohol use. Courson also raised for the first time new theories of benefit eligibility with new onset dates. In particular, Courson argued that he was entitled to benefits under the Bert Bell Plan from June 1986 through November 1988 because alcoholism rendered him disabled during this period. He further argued that his alcoholism was a "League football activity" which entitled him to the higher-paying Football Injury benefits during this period.

9

Courson also claimed that his heart condition resulted from "League football activities" which entitled him to Football Injury benefits under the Bert Bell Plan from November 1988 through July 1, 1993.

The Retirement Board reviewed the supplemental documentation Courson submitted. In addition, the Retirement Board sought and obtained more information about the medical and non-medical issues related to AAS and alcohol use, all of which was made available for Courson's review. After considering all of the record evidence, the Retirement Board, on August 11, 1997, unanimously affirmed its previous determination that Courson only qualified for "Other Than Football Injury" benefits under the Bert Bell Plan for the period December 1, 1988 through July 1, 1993 and "Inactive" benefits under the Player Retirement Plan on an ongoing basis thereafter. The Retirement Board further found that Courson was not totally and permanently disabled from June 1986 through November 1988 under the Bert Bell Plan eligibility rules.

Having exhausted his administrative remedies, Courson then filed this action in the District Court against the defendants, claiming that his application for benefits was denied in violation of ERISA. The parties subsequently filed cross-motions for summary judgment. The District Court, finding that the Retirement Board's decision was reasonable and supported by substantial evidence, entered an order on March 31, 1999, granting summary judgment in favor of the defendants. Courson subsequently filed this timely appeal.

II.

Our review of the District Court's grant of summary judgment is de novo. We employ the same legal standards applied by the District Court in the first instance. Where the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan, the denial of benefits is reviewed under the arbitrary and capricious standard. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437–38 & n.4 (3d Cir. 1997) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S.

10

101, 115 (1989)). Under all of the plans at issue here, the Retirement Board is vested with complete discretion to determine eligibility for benefits and to construe the terms of the plans. Thus, we review the Retirement Board's decisions under the arbitrary and capricious standard on the basis of the administrative record before the Board when it made its decisions. Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 114 (3d Cir. 1994) (citing Firestone, supra, at 115).

Under this deferential standard, a plan administrator's interpretation of a plan may be disturbed "only if it is `without reason, unsupported by substantial evidence or erroneous as a matter of law.' " Abnathya v. Hoffmann–LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (quoting Adamo v. Anchor Hocking Corp., 720 F.Supp. 491, 500 (W.D. Pa. 1989)). A decision is supported by "substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." Daniels v. Anchor Hocking Corp., 758 F.Supp. 326, 331 (W.D. Pa. 1991). With this highly deferential standard in mind, we turn now to the merits of Courson's appeal.

III.

Courson maintains that the Retirement Board's decision was arbitrary and capricious as it was against the weight of substantial evidence. The Retirement Board addressed three distinct claims presented by Courson: (1) a claim for total and permanent disability benefits from 1986 through November 1988 due to alcoholism; (2) a request for reclassification of disability benefits from "Other Than Football Injury" to "Football Injury" for the period November 1988 to July 1, 1993; and (3) a request for reclassification of disability benefits from "Inactive" to either "Active Nonfootball," "Active Football," or "Football Degenerative" benefits for the period July 1, 1993 to present. 2 We will address each of these claims seriatim. Before proceeding with our analysis, however, we will first consider the

_____

2. In this appeal, Courson has wisely abandoned his claim that his AAS abuse caused his cardiomyopathy as the medical evidence to date simply does not support a link between AAS and cardiomyopathy.

11

meaning of the terms "totally and permanently disabled" and "League football activities" as those terms are used in the plan documents.

With respect to disability benefits paid after July 1, 1993, a Player will be deemed totally and permanently disabled under the New Plan in the following situation:

> An Active Player or a Vested Inactive Player . . . will be deemed to be totally and permanently disabled if the Retirement Board finds that he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country. A Player will not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 5.2 merely because such person is employed by the League or an Employer, manages personal or family investments, is employed by or associated with a charitable organization, or is employed out of benevolence.

Player Retirement Plan, S 5.2 at 22-23. Under section 5.2 of the Old Plan, which applies to disability benefits paid before July 1, 1993, the standard for determining total and permanent disability is stated as follows:

> A Player or Vested Inactive Player, other than a Retired Player, shall be deemed to be totally and permanently disabled if the Retirement Board shall find that he has become totally disabled to the extent that he is prevented from or unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country.

Bert Bell Plan, S 5.2 at 28.

Once a determination of total and permanent disability has been made, the eligibility criteria set forth previously for the various levels of benefits must be reviewed in light of the nature and cause of an individual Player's disability. Under the New Plan, the four-part classification scheme is

12

used (Active Football, Active Nonfootball, Football Degenerative, Inactive); under the Old Plan, disabilities are categorized as either "Football Injury" or"Other Than Football Injury."

Under the New Plan, the key to determining the correct benefit category is whether the disability arises or results from "League football activities." The New Plan provides the following definition of "Arising out of League football activities":

> "Arising out of League football activities" means a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. "Arising out of League football activities" will not include any disablement resulting from other employment or activity initiated by the Player outside of official pre-season training, including athletic activity for recreation or for the general purpose of maintaining or achieving playing condition.

Player Retirement Plan, SS 6.4(c) and 6.5(g) at 27 (emphasis added). Under the Old Plan, the key to correctly classifying the disability is determining whether the disability"results from a football injury." The Old Plan defines"Arising out of football activities" as follows:

> "Arising out of football activities" shall mean a disablement arising out of any Game or any pre-season or post-season game of the League or out of football activity supervised by an Employer, including all required or directed activities. "Arising out of football activities" shall not include any disablement resulting from other employment or activity initiated by the Player outside of official pre-season training, including athletic activity for recreational or for the general purpose of maintaining or achieving playing condition.

Bert Bell Plan, S 6.5 at 30 (emphasis added).3 With these

_____

3. This definition comes from a separate article of the Old Plan relating to temporary "line of duty" disability benefits for a player who suffers a "substantial disablement arising out of football activities." We refer to this definition because it provides some guidance in determining whether Courson's disability "result[ed] from a football injury" for purposes of total and permanent disability benefits.

definitions in mind, we turn now to a discussion of the three claims raised by Courson before the Retirement Board.

A.

Denial of Benefits from June 1986 – November 1988

Courson claims that the Retirement Board's decision to deny him total and permanent disability benefits under the Old Plan for the period June 1986 through November 1988 was arbitrary and capricious. He contends that the record establishes that he was totally and permanently disabled during this period due to alcoholism. Courson further contends that his addiction to alcohol arose as a result of the failure by the NFL and its member clubs for whom he played, despite knowledge of Courson's use and abuse of alcohol, to follow NFL policies regarding such abuse. Moreover, Courson contends that by providing alcohol to Players after games, the Steelers supervised and directed his alcohol consumption, thus making it a football activity. Thus, Courson submits that because his alcoholism resulted from a football activity, he is entitled to "Football Injury" benefits. The Board's decision to the contrary, Courson argues, was against the weight of substantial evidence.

In support of these claims, Courson argues that the Board relied solely on a few isolated excerpts from his book, False Glory, to support its conclusion that he was not totally disabled from alcoholism. As explained below, Courson's assertion, however, misstates the basis of the Board's decision and the record evidence.

Courson further argues that the Board failed to consider that the temporary ability to engage in purely physical feats of strength does not necessarily mean that one is capable of employment. In support of this argument, Courson cites Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3d Cir. 1997). Courson specifically refers to our comment in Mitchell that given the characteristics of chronic fatigue syndrome, it was not inconsistent for the plaintiff 's physician to conclude that the plaintiff was totally unable

14

to engage in substantial gainful activity even though his ability to perform isolated activities such as standing, pushing, pulling and communicating was only "somewhat" limited. Id. at 440 n.7. To further support his position, Courson cites McShea v. Schweiker, 700 F.2d 117 (3d Cir. 1983), a case involving a claim for social security disability benefits where the disabling condition was alcoholism. Courson claims he has displayed many of the same signs of disabling alcoholism as the claimant in McShea and, just as the claimant in McShea was not precluded from receiving social security disability benefits due to periods of lucidity and sobriety, so, too, should Courson not be precluded from receiving disability benefits just because the record indicates periodic activity and sobriety. Id. at 118.

Our decision in Mitchell, however, can be distinguished on the facts here. The so-called "isolated" activities performed by Courson were much more than "standing, pushing, pulling and communicating." Moreover, the Retirement Board considered the nature of the activities performed by Courson from June of 1986 through November 1988 in light of his claimed alcoholism, as well as other evidence, and concluded that he was not substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit.

Finally, Courson contends that the Retirement Board ignored substantial evidence that Courson was, in fact, totally disabled from alcoholism for the period June 1986 to November 1988. The substantial evidence which Courson contends the Board ignored consists of the report of Paul Freyder, Courson's affidavit, and his federal income tax returns for the years in question. A review of the record and the Retirement Board's decision, however, requires the opposite conclusion.

Despite Courson's allegations to the contrary, it is clear that the Retirement Board considered all of the evidence, including Paul Freyder's report, Courson's affidavit, and his federal income tax returns, and that its decision was based on substantial evidence. The Retirement Board considered Paul Freyder's report and found it to be completely implausible in light of the facts reported earlier by Courson

15

in his book, False Glory. Freyder, a human services consultant, opined that Courson's alcoholism "consumed his life and substantially prevented him from or rendered him unable to find (and maintain) any employment[from June 1986 through November 1988]." Freyder's report was based entirely on an extensive interview he conducted with Courson in 1997.

On the other hand, in False Glory, which was published in 1991, Courson described his post-football experiences very differently than he described them to Freyder in 1997. For instance, in False Glory, Courson stated that after the Buccaneers released him, Courson then spent the next month in Myrtle Beach working out with weights and running every day to stay in condition with the expectation that another NFL team would express an interest in him. In October, Courson vacationed in Munich. Upon returning from Germany, Courson rented a cabin in Wyoming and began taking notes for his book. In the spring of 1988, upon learning that he was impoverished as a result of a number of bad investments, Courson decided to pursue a career in professional wrestling. Around the same time, Courson also competed in a weight lifting competition. There is no indication from these post-football activities that alcoholism substantially prevented Courson from finding and/or maintaining any employment from June 1986 through November 1988.

The Retirement Board also considered Courson's lack of substantial income from June 1986 through November 1988 but concluded that alone it was not indicative of total and permanent disability as defined by the Old Plan. Here, when Courson's income tax returns are viewed in light of the other evidence, the lack of substantial income is reflective of his intent and attitude between June 1986 and November 1988. In this regard, Courson did not view himself as a person who was unable to engage in any occupation or employment for remuneration or profit because of a disability. Indeed, one gets the impression from his statements in False Glory that he was not really looking for work until his investments severely decreased in the spring of 1988, at which point he decided to go into professional wrestling to make some fast money. Thus, the

16

record evidence here shows that his lack of substantial income is attributable to a conscious decision on his part not to seek employment until he discovered his impoverished situation -- not because he viewed himself as disabled in any way and incapable of working.

Moreover, Dr. Thompson's report and Courson's initial application for disability benefits both state that the onset date of his total and permanent disability is November 26, 1988. Other than Freyder's report and Courson's affidavit which are based on the self-serving statements of Courson made in 1997, no other evidence, medical or otherwise, refutes the onset date of November 26, 1988. Thus, the Retirement Board's conclusion that Courson was not totally and permanently disabled from June 1986 through November 1988 is reasonable and supported by substantial evidence.

B.

Reclassification of Disability Benefits- November 1988 to July 1993

Courson further argues that the Retirement Board's denial of his request for reclassification of his disability benefits from "Other Than Football Injury" to "Football Injury" for the period November 1988 to July 1, 1993 was arbitrary and capricious. He claims that he is entitled to the reclassification because his cardiomyopathy is a total and permanent disability which resulted from a football injury, i.e., an abuse of alcohol which was supervised and condoned by the Steelers and Buccaneers. While we can appreciate counsel's zealousness to fashion an argument on Courson's behalf in support of reclassifying his benefits to "Football Injury" benefits under the Old Plan, we do not find any merit to his argument.

The Retirement Board carefully considered whether Courson's self-described alcohol abuse was an activity "supervised by," or "required or directed" by, the Steelers or Buccaneers. In particular, the Retirement Board considered: (1) the NFL policy expressly prohibiting serious misuse of alcohol; (2) that the Steelers provided alcohol to

17

players after games but only a maximum of two cans of beer per player; (3) then Steelers' coach Chuck Noll's statement that Courson displayed no outward signs that he was alcoholic or abusing alcohol; and (4) Courson's earlier statements in False Glory that episodes of heavy drinking occurred at bars or at home, not at the club facilities, that he did not believe he was an alcoholic because he did not match the typical profile —— he was rarely late for work, never started a fight in a bar, and did not drink every day —— and that he was a big guy who could drink a lot without getting roaring, sloppy drunk.

The Retirement Board found that alcohol abuse and AAS consumption did not constitute activities "required," "directed," or "supervised" by the NFL or either the Steelers or Buccaneers. The Board completely rejected Courson's argument that the teams' alleged failure to supervise his alcohol and AAS consumption somehow rendered those activities "League football activities" within the meaning of the plan document. To the contrary, the Board found the evidence showed "Courson decided to overindulge in alcohol and to use AAS on his own initiative, on his own time, and in knowing contravention of League policy."

We do not find any fault with the Retirement Board's conclusion. Although the medical evidence indicates that alcohol consumption is a cause of cardiomyopathy, the facts here simply do not support a conclusion that alcohol consumption is an activity "supervised," "required or directed" by the League clubs. Likewise, our review of the evidence causes us to conclude that the record clearly shows that Courson decided to overindulge in alcohol consumption on his own initiative, on his own time, in contravention of League policy. Moreover, no precedent exists for finding that the failure to supervise Courson's alcohol intake somehow renders that activity one that "arises out of football activities" as meant by the Plan. Given these facts, it would be unreasonable to conclude that Courson's alcohol abuse was an activity "supervised", "required or directed" by the Steelers or Buccaneers. Although alcohol consumption may have caused or contributed to Courson's cardiomyopathy, such alcohol consumption was not an activity "supervised,""required or

18

directed" by an NFL team. Therefore, Courson's argument that his disability arose from a football injury lacks merit. The Retirement Board's denial of his request to reclassify his disability benefits under the Old Plan was thus reasonable and supported by substantial evidence.

C.

Reclassification of Disability Benefits– July 1993 to Present

With regard to his claim for benefits under the New Plan, Courson makes two arguments. First, Courson argues that the Retirement Board's denial of his request to reclassify his disability from "Inactive" to "Active Nonfootball" benefits was arbitrary and capricious. In support of his argument, Courson submits that he presented substantial evidence establishing his eligibility for "Active Nonfootball" benefits under the New Plan. Specifically, Courson claims he presented substantial evidence proving: (1) that his alcoholism arose while he was an active Player, and (2) that his alcoholism caused him to be totally and permanently disabled within twelve months of his retirement. Courson further contends that the Retirement Board rejected his claim solely on the basis that Courson failed to establish that his disability existed within twelve months of his June 1986 retirement. Courson submits that the record is replete, however, with evidence that proves his disease satisfied the requirements for "Active Nonfootball" benefits.

Courson's argument lacks merit. First of all, a prerequisite to qualifying for "Active Nonfootball" benefits is that the disability did not result from "League football activities." In all other respects, Courson has maintained that his disability did result from a League football activity, alcohol consumption. He cannot have it both ways. Nonetheless, Courson meets this prerequisite since the Retirement Board's conclusion that his disability did not result from a League football activity is reasonable and supported by substantial evidence. Courson's claim of eligibility for "Active Nonfootball" benefits fails, however, because he has not shown that his disability,

19

cardiomyopathy, arose while he was an active Player and that it caused him to be totally and permanently disabled shortly after the disability first arose.4 Although Courson avers that the record is replete with evidence that proves he satisfied the eligibility requirements for "Active Nonfootball" benefits, he fails to identify the particular evidence that supports his conclusory statement.

Courson's second reclassification argument pertains to the Retirement Board's denial of his request to reclassify his disability from "Inactive" to either "Active Football" or "Football Degenerative" benefits. Courson contends the Board's decision denying such reclassification was arbitrary and capricious because the Board's conclusion that alcohol use was not a "League football activity" contradicted the substantial evidence. Specifically, Courson contends that the Retirement Board ignored the simple and indisputable facts -- that alcohol consumption was managed by the Steelers; managing the activity is the equivalent of supervising the activity; since his disability was caused by alcohol consumption which was an activity supervised by the Steelers, the disability was caused by a "League football activity."

In support of his argument, Courson submits that the following unrebutted substantial evidence proves a correlation between the use of alcohol and "League" play: (a) incessant pressure by NFL teams and the League placed on athletes to gain every possible edge; (b) the NFL was

_____

4. Courson maintains that "shortly after" includes disabilities where the claimant becomes totally and permanently disabled within twelve months of his retirement. As stated earlier, however, the Player Retirement Plan provides that a disability will be conclusively deemed to have occurred "shortly after" if the claimant becomes totally and permanently disabled within six months after the disability first arises.

Although Courson became totally and permanently disabled from cardiomyopathy within six months after his disability first arose (i.e., November 26, 1988), he cannot show that the cardiomyopathy arose while he was an active player. Other than the single report in 1985 of atrial fibrillation, nothing in the record indicates that he suffered any symptoms of this disease until November 1988. Thus, Courson first became totally and permanently disabled on November 26, 1988, after he had been retired from football for over two years.

20

fully aware of alcohol abuse by certain players and declined to act or to enforce its own policies; and (c) Courson drank incessantly at first to quell the pain from football injuries which led to his uncontrollable urge to drink continuously. Moreover, Courson claims the Retirement Board refused to acknowledge sworn statements of his former teammates regarding the widespread availability of alcohol after home and away games. Thus, Courson maintains that he is entitled to "Active Football" benefits because his disability results from "League football activities,"first arose while he was an active Player and caused him to be unable tofind or maintain employment within twelve months of his retirement.

As we stated earlier, the evidence supports a contrary finding. While all of Courson's assertions linking alcohol consumption with League play may be true, they fall short of establishing that the NFL teams actually condoned or encouraged the consumption of alcohol, let alone in the large quantities consumed by Courson. Any perceived pressure on the part of the Players was self-imposed. If anything, the evidence shows that the League and member teams discouraged alcohol abuse. To this end, when Courson mentioned his alcohol abuse to the Buccaneers, they referred him to a psychiatrist for counseling. When he played for the Steelers, Courson did not exhibit any behavior that indicated that he had a drinking problem. As he admitted in his book, Courson's binge drinking occurred in bars and at home--not in the clubhouse.[5] Courson's use of alcohol to quell the pain from his football injuries was clearly self-imposed and thus not " `supervised' or `required or directed' " by any NFL team. Accordingly, because Courson has failed to establish that his disability resulted

_____

5. Courson refers to the affidavits of teammates regarding widespread alcohol consumption in the clubhouse. However, an examination of Craig Wolfley's affidavit reveals nothing more than that alcohol was served on the plane rides home from away games, that alcohol was used by some NFL players as a "primitive pain killer for bumps, bruises and injuries," and that NFL management appeared to place a greater emphasis on preventing alcohol abuse towards the end of his career (1980-1991). Nothing in Mr. Wolfley's affidavit supports Courson's theory that the NFL " `supervised' or `required or directed' " alcohol consumption.

from a "League football activity," he is not eligible for "Active Football" benefits.

In the alternative, Courson argues that if we find the Retirement Board's decision that Courson did not become totally and permanently disabled until November 1988 was supported by substantial evidence, he is nonetheless entitled to "Football Degenerative" benefits. Courson contends he has satisfied the eligibility criteria because his cardiomyopathy was caused by alcoholism which arose out of a "League football activity," i.e., alcohol consumption, and he became totally and permanently disabled at the age of 33 and within three years after the end of his last Credited Season (1985). As discussed previously, however, the Retirement Board's conclusion that alcohol consumption is not a "League football activity" is reasonable. Thus, because Courson's disability does not arise from a "League football activity," he is not entitled to "Football Degenerative" benefits under the New Plan.

Accordingly, we cannot say that the Retirement Board's decision was arbitrary and capricious on the record evidence in this case.

IV.

For the reasons set forth above, we will affirm the judgment of the District Court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit